IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Prodigy Network, LLC., *et. al.*,[1] | Case No.: 21-10622 (JTD) |
| Debtors. | **Re. Docket Nos. 69, 105, and 116** |

### DECLARATION OF JEOFFREY L. BURTCH IN SUPPORT OF MOTION FOR ENTRY OF (I) AN ORDER (A) APPROVING BIDDING PROCEDURES IN CONNECTION WITH SALE OF ESTATE ASSETS, (B) SCHEDULING AN AUCTION AND HEARING TO CONSIDER THE PROPOSED SALE, AND (C) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (II) AN ORDER (A) APPROVING THE SALE AND (B) GRANTING CERTAIN RELATED RELIEF

Jeoffrey L. Burtch makes this Declaration in Support of Trustee's Motion for Entry of (I) an Order (A) Approving Bidding Procedures in Connection With Sale of Estate Assets, (B) Scheduling an Auction and Hearing to Consider the Proposed Sale, and (C) Approving the Form and Manner of Notice Thereof; and (II) an Order (A) Approving the Sale and (B) Granting Certain Related Relief (the "Sale Motion").[2] [D.I. 69]

1. I am the duly appointed chapter 7 trustee in these jointly administered cases, which were filed on March 25, 2021 (the "Petition Date").

2. Since my appointment, I have endeavored to understand the nature of the business, the reasons for the failure of the business, and the assets and liabilities of the Debtors.

---

[1] The debtors in these cases (the "Debtors") are the following entities (the respective case numbers for each estate follows in parentheses): 1234 W. Randolph Realty Associates LLC (21-10612-JTD), Prodigy Shorewood Master Rep Fund LLC-1234 W Randolph Series (21-10613-JTD), 1234 W Randolph Newco, Inc. (21-10614-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC-1234 W Randolph Series (21-10615-JTD), 1400 N Orleans Realty Associates LLC (21-10616-JTD), Prodigy Shorewood Master Rep Fund LLC-1400 N. Orleans Series (21-10617-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC- 1400 N Orleans Series (21-10618-JTD), 1400 N Orleans Newco, Inc. (21-10619-JTD), Prodigy Network Miami, LLC (21-10620-JTD), The Assemblage Hospitality, LLC (21-10621-JTD), Prodigy Network, LLC (21-10622-JTD).

[2] Capitalized terms not otherwise defined herein shall have the meanings assigned in the Sale Motion.

3. Toward that end, I have engaged Cozen O'Connor as bankruptcy counsel as well as Katherine Kramer and her firm, DGW Kramer LLP, as special litigation counsel. Katherine and her firm were involved in pre-petition litigation against the Debtors on behalf of certain overseas investors and therefore already had a good deal of background regarding the Debtors.

4. On the Petition Date, the Debtors' assets included interests held by two of the Debtors in entities that owned entities with interests in commercial real estate in Chicago. I learned of one of these interests through conversations my counsel had with various parties, as the relevant asset was not scheduled.

5. In one case, the indirect subsidiary owned real estate at 1400 North Orleans in Chicago and in the other case, the indirect subsidiary held rights in a purchase agreement for a property at 1234 West Randolph in Chicago.

6. Specifically, Debtor 1234 W Randolph Realty Associates LLC ("1234 Debtor") holds a 90% interest in 1234 W Randolph JV LLC ("1234 JV"). 1234 JV holds a 100% interest in 1234 W Randolph Property Company LLC ("1234 PropCo"), which is a party, by way of assignment, to a Purchase and Sale Agreement dated November 29, 2017, under which 1234 PropCo has the right to acquire real property located at 1234 West Randolph.

7. 1234 Debtor is not the managing member of 1234 JV. The Purchase and Sale Agreement had a closing date that has been extended numerous times, most recently under a June 30, 2021 Eleventh Amendment to Purchase and Sale Agreement, which extended the closing deadline to December 31, 2021.

8. The Purchase and Sale Agreement had a stated purchase price of $10,000,000, and I understand that 1234 Debtor would be required to meet a capital call of at least several million dollars more than is presently in the estate to close on the purchase.

9. Debtor 1400 N Orleans Realty Associates LLC ("1400 Debtor") holds a 90% interest in 1400 N Orleans JV LLC ("1400 JV"). 1400 JV holds a 100% interest in 1400 N Orleans Property Company LLC ("1400 PropCo"), which owns the real property located at 1400 North Orleans in Chicago.

10. 1400 Debtor is not the managing member of 1400 JV.

11. I learned that on or about March 15, 2021, or ten days before the Petition Date, the 1234 Debtor and 1400 Debtor purported to enter into amendments to the LLC agreements for 1234 JV and 1400 JV that modified the members' rights. Among other things, the amendments limited or eliminated certain governance rights that were afforded to 1234 Debtor and 1400 Debtor. These amendments were signed on behalf of the 1234 Debtor and 1400 Debtor by Juanita Galvis, the spouse of the now deceased principal of the Debtors, who died intestate in May 2020. I have not been provided with any documentary evidence establishing Galvis's authority to enter into the amendments.

12. Based upon conversations with counsel, who had spoken with brokers and others with respect to a potential sale of these interests, I determined that the best approach to attempt to sell these interests would be to ascertain whether the 10% partner in the JVs was interested in acquiring the 90% interests held by the debtor entities.

13. One objecting party has argued to counsel that the Trustee should not proceed with this sale, but rather commence litigation against the managing member to avoid the amendments that were made to the governance documents on the eve of bankruptcy, remove the managing member, and/or seek to substantively consolidate 1400 JV and 1400 PropCo in these bankruptcy cases, on the assumption that the estate would be able to sell the underlying real property and/or realize more value.

LEGAL\55161357\1

14. Based upon years of experience, it is my view that any of the alternatives suggested by the objecting parties would embroil the estates in expensive and lengthy litigation delaying the ultimate sale, potentially by years, with no certainty of outcome.

15. It appeared that any delay in concluding the sale of the 1234 Interest may very well result in the failure to close on the acquisition of the property at 1234 West Randolph, and therefore render the estate's interest in that asset essentially worthless.

16. I have been advised, through counsel, that the value of the 1400 Interest was also depreciating due to various reasons, and I therefore concluded that it was in the best interests of the estate to commence the sale process on the timeline proposed in the Sale Motion. These reasons include the accrual of over $3.6 million in unpaid payables on the project, the expiration of building permits, and the managing member's representation that a capital call would be needed for an additional $5 million from the members.

17. My counsel, at my direction, began discussions with the managing members of the JVs through counsel. These discussions went on for several weeks and multiple offers and counter offers were exchanged.

18. Ultimately, after multiple rounds of negotiations, I decided to move forward with the stalking horse bids that are described in the sale motion - $100,000 for the 1234 asset and $2,250,000 for the 1400 asset.

19. On September 23, 2021, I filed the Sale Motion, in which we recited through the stalking horse APAs that I was selling all "right, title, and interest" in the JV interests.

20. On October 6, 2021, the Court entered an order approving bidding procedures in connection with the sale.

21. The bidding procedures set forth certain dates and deadlines in connection with the sale process:

- October 28, 2021 – Deadline for qualified bids
- November 1, 2021 – Auction date
- November 3, 2021 – Sale hearing date

22. Due to court scheduling issues, the sale hearing date was later changed to November 8, 2021.

23. During the course of the seven plus months that these cases have been pending I, through counsel, have communicated with several parties interested in these assets, and have signed four NDAs with parties interested in one or both assets.

24. The troubles facing this business and the filing were widely publicized for several months prior to the filing of the petitions, and had become common knowledge among those who could realistically be considered potential bidders. Under these circumstances, in my business judgment, neither employment of brokers nor additional advertising would have led to a better result than what was achieved through the bidding procedures and auction.

25. I received two bids for the assets, one of which was determined to be a Qualified Bid; this bidder was Lakshmi Capital All Weather Fund, LP ("Competing Bidder").

26. The Competing Bidder submitted a bid of $150,001 for the 1234 Interest, as well as any rights and claims with respect to the pre-filing amendments to the 1234 JV governance documents, and $2.5 million for the 1400 Interest, as well as any rights and claims with respect to the pre-filing amendments to the 1400 JV governance documents (collectively, the "Competing Bids").

27. The Competing Bidder advised me, through counsel, that it would not bid on the 1400 Interest unless it was clear that any and all claims related to the pre-filing amendments to the 1400 JV governance documents were included in the transaction.

28. I believe that closing on the sale of the 1400 asset to Lakshmi on the terms set forth in the APA attached to the proposed order will maximize value of the assigned claims.

29. The Competing Bidder submitted an account statement showing financial capacity to close and tendered a 10% deposit as required under the bid procedures.

30. Following the deadline for qualified bids, counsel to the stalking horse bidders asked whether there was a fully qualified bidder. In response, my counsel provided the name of the Competing Bidder and the amounts of the Competing Bids. At no time, did counsel to the stalking horse bidders request copies of the Competing Bids.

31. The Competing Bidder and I learned approximately 30 minutes prior to the start of the auction that a payment of approximately $85,000 was due the day of the auction and another such payment would be due on December 1 to maintain 1234 PropCo's right to close on the sale on December 31, and avoid forfeiture. As such, the bidding for the 1234 asset included the obligation to pay this amount at the conclusion of the auction. This information did not appear to have any chilling effect on the Competing Bidder's willingness to participate in the auction.

32. I conducted the auction, through my counsel, as required under the bid procedures, and the bidding was extensive and robust, as set forth in the auction transcript filed with the Court.

33. At the beginning of the Auction, my counsel informed the attendees that the assets to be sold included:

> The 1234 West Randolph Realty Associates LLC's rights with respect to an interest in 1234 West Randolph JV LLC, which I will refer to going forward as the 1234 asset.
>
> And the second asset is the 1400 North Orleans Realty Associates, LLC's rights with respect to an interest in 1400 North Orleans JV LLC, and going forward I'll refer to that asset in the shorthand way as the 1400 asset.

See Transcript of Auction, 9: 14-24 [D.I. 113].

34. At the conclusion of the auction, the Competing Bidder submitted the highest bid for the 1400 asset in the amount of $7.65 million, and for the 1234 asset in the amount of $250,001, plus the $85,000 payment mentioned previously. The stalking horses were locked in as the Alternate Bidders, at $7.5 million for the 1400 asset and $225,000, plus $85,000, for the 1234 asset.

35. Shortly after the auction concluded, the Competing Bidder stated that it was not willing to make the immediate $85,000 payment contemplated under its winning bid without a court order, and stated its intent to not proceed with its acquisition of the 1234 asset.

36. As such, my counsel reached out to the stalking horse and stated my intention to seek approval of its back-up bid of $225,000, plus the $85,000 payment. I understand that the $85,000 was in fact paid by the stalking horse.

37. I believe that both bidders conducted themselves in good faith through the conclusion of the Auction.

38. Based upon information provided to me, I believe that both bidders have the financial ability to close on the timelines required under the agreements.

39. I believe that the auction rules were followed, that there were two bidders that had a strong desire to acquire the assets as reflected by the fact that almost 40 bids were submitted, and that the auction was a success and that the estates realized fair value for the assets.

40. Lastly, I believe that the proposed sales, as embodied in the asset purchase agreements filed with the Court on November 3, 2021, including the Alternate Bid for the 1400 asset, are in the best interests of creditors and ought to be approved by the Court.

Pursuant to 28 U.S.C. §1746, I declare that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  November 15, 2021                              */s/ Jeoffrey L. Burtch*
                                                       Jeoffrey L. Burtch