# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Prodigy Network, LLC, *et al.*,[1] | Case No. 21-10622 (JTD) |
| Debtors. | **Objection Deadline: November 15, 2022 at 4:00 p.m. (ET)**<br>**Hearing Date: November 22, 2022 at 11:00 a.m. (ET)** |

## TRUSTEE'S MOTION FOR ORDER: (I) APPROVING SETTLEMENT AGREEMENTS PURSUANT RULE 9019; (II) APPROVING SALE OF INSURANCE POLICY TO CARRIER; AND (III) GRANTING RELATED RELIEF

Jeoffrey L. Burtch, the duly appointed Chapter 7 Trustee (the "Trustee") for the estates of the above-captioned debtors (the "Debtors"), by and through his counsel, hereby files this motion for entry of an order: (I) approving the Settlement Agreements (as further defined below, the "Settlement Agreements") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (II) approving the sale of an insurance policy to the insurer; and (III) granting related relief (the "Motion"), and in support thereof, states as follows:

## JURISDICTION, VENUE, PREDICATES FOR RELIEF

1.      The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each case follows in parentheses): 1234 W. Randolph Realty Associates LLC (21-10612-JTD), Prodigy Shorewood Master Rep Fund LLC-1234 W Randolph Series (21-10613-JTD), 1234 W Randolph Newco, Inc. (21-10614-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC-1234 W Randolph Series (21-10615-JTD), 1400 N Orleans Realty Associates LLC (21-10616-JTD), Prodigy Shorewood Master Rep Fund LLC-1400 N. Orleans Series (21-10617-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC- 1400 N Orleans Series (21-10618-JTD), 1400 N Orleans Newco, Inc. (21-10619-JTD), Prodigy Network Miami, LLC (21-10620-JTD), The Assemblage Hospitality, LLC (21-10621-JTD), and Prodigy Network, LLC (21-10622-JTD).

363[2] and Bankruptcy Rules 6004 and 9019.

4.      Pursuant to Local Rule 9013-l(f), the Trustee consents to the entry of a final order with respect to this Motion if it is determined that the Court lacks adjudicatory authority under Article III of the United States Constitution to enter such final order absent consent of the parties.

## PRELIMINARY STATEMENT[3]

5.      By this Motion, the Trustee is seeking Court approval of the settlement of certain claims, achieved through mediation, under which the Debtors' estates will receive a settlement payment in the amount of $3,164,500.00 from Great American Insurance Company ("Great American") under that certain Private Equity Liability Insurance Policy No. PEP2788734 (the "Policy"). After payment of the Capkanis Settlement Amount (as defined below), the Debtors will realize a net benefit of $3,000,000.00.

6.      The settlement resolves not only the estates' claims under an insurance policy covering claims against the Debtors' directors, officers, general partners, managers, and equivalent executives or employees (collectively, the "Directors and Officers"), but also claims that had been asserted by Emily Capkanis, a former employee, which Capkanis maintained were covered by the Policy.

7.      Absent a settlement of these claims, the Trustee would have to engage in costly and time-consuming litigation of his claims against the Directors and Officers (the "D&O Claims"), while also potentially having to defend against Capkanis's claims (the "Capkanis Claims").

8.      The Policy provides coverage for certain claims against, among others, the Directors and Officers and the Debtors, for liability arising out of certain specified acts or

---

[2] Unless otherwise indicated, all statutory citations are to the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code")).

[3] While Great American and Capkanis support approval of the settlements, the statements and contentions in this Motion are solely those of the Trustee.

omissions, as well as costs of defense. Coverage for all losses (including costs of defense) under the Policy is limited to $5 million. Upon information and belief, prior to the Petition Date, Great American had advanced approximately $250,000.00 in defense costs, thereby reducing the remaining coverage to approximately $4.75 million.

9. The costs of litigating the D&O Claims and the Capkanis Claims would be substantial, and would therefore significantly reduce the net recovery that the estates might realize under the Policy.

## BACKGROUND

10. On March 25, 2021, the Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code.

11. On or about March 26, 2021, the Trustee was appointed as interim trustee pursuant to Section 701 of the Bankruptcy Code.

12. The meeting of creditors held pursuant to Section 341 of the Bankruptcy Code was started on April 29, 2021 and was concluded on May 19, 2021. The Trustee is now serving pursuant to Section 702(d) of the Bankruptcy Code.

## A. D&O Claims

13. The Debtors were part of a large corporate structure (the "Prodigy Enterprise") that was involved in various real estate development projects and related ventures. To finance many of these projects, the Debtors raised capital through a crowdfunding platform, soliciting investments from individuals in the United States and abroad.

14. Substantially all of the Debtors' operations and projects were primarily controlled by Rodrigo Niño until his death in May 2020. Upon information and belief, other individuals who

participated in management included:[4]

      a.      Brian Newman, Vice President of Business development from March 2012 until April 2019, and who worked on strategic planning and efforts to expand business into new markets;

      b.      Carey Fieldcamp, Chief Financial Officer from approximately January 2019 until mid-2020;

      c.      Vincent Mikolay, Chief Operating Officer from late 2017 until late 2018;

      d.      Leonard Chinchay, Vice President of Client Relations from the founding of the enterprise in approximately 2013 until June 2019;

      e.      Bill Garcia, Chief Operations Officer from approximately 2015 until 2017;

      f.      Alejandra Rincon, Vice President of Operations from December 2017 to February 2019, Business Development Director from June 2016 until December 2017, and Marking Director from June 2015 to June 2016; and

      g.      Juanita Galvis, the separated spouse of Mr. Niño, who assumed control of Prodigy Network LLC and several other wholly-owned entities after Mr. Niño's death.

15.     The Prodigy Enterprise engaged in investment crowdfunding and real estate development, along with property management through The Assemblage brand, from approximately 2013 through 2020. The crowdfunded portfolio included six projects in New York, and two in Chicago.

16.     Shorewood Real Estate Group ("Shorewood"), which is owned and controlled by S. Lawrence Davis, collaborated closely with many Prodigy entities, the Directors and Officers, and Prodigy Network on Prodigy's New York real estate projects. [5]

17.     In addition to soliciting investments in the various entities that were involved in

---

[4] Debtor Prodigy Network, LLC ("Prodigy Network") generally served as manager of the entities within the Prodigy Enterprise, either formally or *de facto*, and the leadership team of Prodigy Network served also as the leadership team of the Prodigy Enterprise. Unless otherwise indicated, references to the titles of the Directors and Officers are to their roles with Prodigy Network.

[5] Mr. Davis and Mr. Niño each controlled 50% of a shared entity named Prodigy Shorewood Investment Management LLC ("PSIM"), which served as investment manager for many Prodigy Enterprise projects. PSIM is among the insureds under the Policy. Prodigy had numerous joint ventures with Shorewood.

particular projects, Prodigy Network undertook an offering of corporate securities in Prodigy Network itself in 2018 and 2019.

18.     By early 2019, the Prodigy Enterprise was showing signs of serious financial distress.  In or around June 2019, Mr. Niño purported to resign as CEO.  However, no replacement CEO was ever named, and Mr. Niño continued to exercise substantially complete control over the Prodigy Enterprise.

19.     Neither Prodigy Network nor any other part of the Prodigy Enterprise ever had a board of directors, and Mr. Niño effectively performed all functions that would typically be the responsibility of a board.

20.     In or around June 2019, the Prodigy Enterprise laid off the majority of its workforce, and engaged consultants and counsel to assist with restructuring efforts. Around this same time, Prodigy Network engaged in restructuring discussions with at least one potential buyer. However, in or around January 2020, the primary restructuring consultant resigned from that role, apparently on the grounds that no one within the Prodigy Enterprise was providing the information necessary for the project.

21.     In May 2020, Mr. Niño passed away after a protracted battle with cancer.  Mr. Niño had recovered from an earlier bout of cancer several years earlier.  No replacement CEO or other lead executive was named, and the Prodigy Enterprise effectively had no leadership from the time of Mr. Niño's death through the Petition Date.

22.     In 2019 and 2020, numerous investors filed civil lawsuits against a number of Prodigy Network affiliates. No defense was offered in the majority of these suits, leading to a number of defaults.

23.     Throughout the above-described history, it appears that there are grounds to allege

that the Directors and Officers engaged in a number of wrongful acts and omissions including, but

not limited to, the following:

a. Gross mismanagement, which led to the collapse of substantially the entire Prodigy Enterprise by mid-2019 to early 2020. This mismanagement stemmed, at least in part, from a failure of corporate governance. The Directors and Officers permitted control to be unreasonably concentrated in Mr. Niño, with no sort of reasonable oversight or consultation.

b. Mr. Niño unreasonably confined management within Prodigy Network, which resulted in a lack of shared knowledge regarding financial and management problems faced by different parts of the Prodigy Enterprise. Executives and employees were given information only as deemed necessary to complete their jobs, but not sufficient to understand the workings of the Prodigy Enterprise as a whole.

c. Mr. Niño and others permitted serious cost overruns on numerous development projects, and also authorized several ill-conceived pet projects by Mr. Niño, including the acquisition a property in upstate New York to develop into a retreat. To make matters worse, the property was purchased from Mr. Niño at a questionable valuation.

d. Prior to Mr. Niño's death, the Directors and Officers breached their duties by failing to create a succession plan. Mr. Niño had suffered from cancer a number of years earlier, and knew there was a significant chance of recurrence. By 2019, if not sooner, Mr. Niño was again receiving treatment for cancer. Despite this, neither Mr. Niño nor any of the other Directors and Officers enacted a succession plan in preparation for Mr. Niño's death or disability.

e. After Mr. Niño's death, the Directors and Officers breached their fiduciary duties by failing to take reasonable steps to preserve assets, despite Prodigy's apparent insolvency. In addition to failing to adopt any reasonable restructuring plans, they permitted Shorewood to seize control or otherwise dispose of numerous assets that may have had value to the Prodigy Enterprise.

24. While there may be defenses, the Trustee has reason to believe that some or all of

failures of the Directors and Officers described above may constitute wrongful acts giving rise to

coverage under the Policy. On or about September 10, 2021, therefore, the Trustee, through special

litigation counsel, gave Great American notice of circumstances that there may be grounds to assert

claims under the Policy. Great American and the Trustee thereafter began discussions in an effort

to reach a consensual settlement of the estates' covered claims.

## B. Capkanis Claims

25.     According to various filings in this Court and elsewhere, Emily Capkanis was employed by Prodigy Network from December 2017 until she was terminated in June 2019.

26.     On or about September 12, 2019, Ms. Capkanis filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging that Prodigy Network had discriminated against her based on sex and disability, and further alleging that Prodigy Network had retaliated against her for engaging in protected activity.

27.     Prodigy Network asserted defenses to Ms. Capkanis's claims, and, on or about February 26, 2020, the EEOC issued a Dismissal and Notice of Rights, stating that it was unable to conclude that violations of statutes had occurred.

28.     Thereafter, on or about September 2, 2020, Ms. Capkanis commenced an action by filing a complaint in the United States District Court for the Southern District of New York, asserting substantially similar claims to those that she had filed with the EEOC. Ms. Capkanis filed an amended complaint in the action on September 14, 2020

29.     By this time, Mr. Niño had died, and without effective management in place or funds available to retain counsel, Prodigy Network failed to answer Ms. Capkanis's complaint, and on March 17, 2021, default judgment was entered against Prodigy Network.

30.     By motion filed with this Court on September 24, 2021, Ms. Capkanis sought relief from the automatic stay to allow her to return to the Southern District of New York to liquidate her claim and to thereafter seek recovery under the Policy. See Motion of Emily Capkanis for Relief from the Automatic Stay Pursuant to Section 362(d) of the Bankruptcy Code (the "Capkanis Lift Stay Motion") [D.I. 74].

31.     The Trustee opposed the Capkanis Lift Stay Motion largely on the grounds that the Trustee was investigating the D&O Claims, and should be permitted to seek recovery for the benefit of the estates and all creditors before a single creditor is allowed to recover, and thereby reduce the coverage remaining under the Policy.

32.     At the conclusion of a hearing on October 28, 2021, the Court scheduled an evidentiary hearing on the Capkanis Lift Stay Motion for January 28, 2022. While the parties worked to reach a consensual resolution, they agreed to indefinitely continue the evidentiary hearing.

## C. Mediation and Summary of Settlement Agreements[6]

33.     After extensive communications regarding potential claims and defenses, the parties agreed to participate in mediation. The mediation was held on May 24, 2022.

34.     No resolution was reached at the conclusion of the mediation, but settlement negotiations continued, and by late July 2022, the parties had reached agreement on the material terms of a comprehensive resolution of claims by and among the Trustee, Great American, and Ms. Capkanis.[7]

35.     The parties eventually reduced the terms of their agreements to those set forth in the following:

> a.     That certain Settlement Agreement and Release between the Trustee and Great American (the "Great American Settlement Agreement"). A true and

---

[6] This Motion contains a summary of certain terms of the Settlement Agreements, and does not set out all of their terms. To the extent of any inconsistency between the summary set forth in this Motion and the Settlement Agreements, the Settlement Agreements shall govern. Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings provided in the Settlement Agreements.

[7] In addition to coverage under the Policy, Prodigy Network and certain agents and affiliates were insured under an excess policy from The Hartford (the "Hartford Policy"), which provides $5 million in coverage following that under the Policy. The Hartford participated in the mediation, but no agreement was reached regarding any claims related to the excess policy. The Trustee reserves all rights under the Hartford Policy, and nothing in the Settlement Agreements, this Motion, or the proposed order shall be deemed a waiver of any such rights.

correct copy of the Great American Settlement Agreement is attached hereto as Exhibit A.

b. That certain Settlement Agreement and Release between the Trustee and Ms. Capkanis (the "Capkanis Settlement Agreement"). A true and correct copy of the Capkanis Settlement Agreement is attached hereto as Exhibit B.

(the Great American Settlement Agreement and the Capkanis Settlement Agreement shall be referred to, together, as the "Settlement Agreements").

36.     Pursuant to the Great American Settlement Agreement, Great American will pay the sum of $3,164,500.00 (the "Great American Settlement Amount"). In exchange for payment of the Great American Settlement Amount, Great American shall be released from:

a. any and all Claims by any Person, including any Insured, for insurance coverage, payment, or other obligations, rights or recoveries of any kind under the Policy;

b. any and all Released Claims, including without limitation any obligations or duties of any kind arising from, or that could have arisen from, such Released Claims; and

c. any and all Claims, whether known or unknown, suspected, claimed or alleged, fixed or contingent, arising from, related to, or in connection with the making, drafting, negotiation, or execution of the Agreement.

Exhibit A, Great American Settlement Agreement, § V(1).

37.     The Great American Settlement Agreement further provides that

Effective immediately upon the receipt of the Settlement Payment by the Trustee and without any further action being required, the Policy, and any and all of the Insureds' rights and interests in the Policy, shall be deemed to have been sold back to Great American pursuant to sections 363(b) and (f) of the Bankruptcy Code free and clear of any interest or right in the Policy, with such interests or rights attaching to the Settlement Payment in accordance with their respective priorities. The Policy shall be deemed exhausted and terminated for all purposes, all rights, duties, and coverage under the Policy shall be fully and finally extinguished, and the Policy shall no longer remain in effect. Furthermore, the Approval Order shall provide that (i) all Persons who hold or assert, or may in the future hold or assert, any claim against an Insured, arising in connection with any activities covered by the Policy, or in connection with the Insureds' activities giving rise to the claims made or to be made under the Policy, or (ii) any other Person who may claim to be an insured, additional insured, or otherwise entitled to any benefit or recovery, directly or

indirectly, from or under the Policy, are permanently stayed, restrained, and enjoined from asserting any such claim, right or entitlement, commencing a proceeding, or taking any other action against Great American for the purpose of obtaining any recovery or other relief from Great American or under or in connection with the Policy.

*Id.*, § V(2).

38.     The Great American Settlement Agreement is conditioned on, among other things, approval of the Capkanis Settlement Agreement. *Id.*, § II.

39.     Pursuant to the Capkanis Settlement Agreement, the Trustee shall pay Ms. Capkanis the sum of $164,500.00 (the "Capkanis Settlement Payment").

40.     In exchange for the Capkanis Settlement Payment, Ms. Capkanis shall give various releases, including, but not limited to, the following:

    a.     The Debtors and their respective estates shall be released from any liquidated or unliquidated Claim;

    b.     Any Insured under the Policy shall be released from any liquidated or unliquidated Claim to the extent such Claim is related to the Employment Practices Claims; and

    c.     Great American shall be released from any liquidated or unliquidated Claim as a result of or related to its insurance relationship with any Insured under the Policy.

Exhibit B, Capkanis Settlement Agreement, § IV.

41.     The Capkanis Settlement Agreement is conditioned on, among other things, approval of the Great American Settlement Agreement. *Id.*, § II.

42.     The Trustee believes that there are likely defenses to the Capkanis Claims, and that there are significant questions regarding the availability of coverage for the Capkanis Claims under the Policy. The cost to the estates of litigating these issues, however, may very well exceed the amount of the Capkanis Settlement Payment, and settlement therefore is reasonably calculated to best preserve the value of the estates.

43.     Furthermore, Great American unequivocally stated that any settlement would have

to fully release it from any further liability under the Policy. Because Capkanis had stated an intention to pursue recovery from the Policy, settlement of the Capkanis Claims was necessarily a condition of the settlement with Great American.

44.     With respect to the Great American Settlement Agreement, while the Trustee believes the D&O Claims may have merit and that damages may exceed the total amount of coverage remaining under the Policy, there is no question that litigation of those claims would be difficult and costly, and there can be no certainty that the Trustee would prevail.

45.     In general, claims of the sort at issue are typically very fact intensive and complex, and therefore expensive to prepare and litigate. In the present case, it is reasonable to believe that litigation would be particularly difficult. Among other things, the most significant D&O Claims involve Rodrigo Niño's conduct as the party primarily responsible for overall management of the Prodigy Enterprise. Because Mr. Niño is deceased, collection and presentation of evidence would be more complicated than in a typical case.

46.     Furthermore, in evaluating any proposed settlement, it is critical to bear in mind that the Policy is a "wasting" policy, meaning that it covers costs of defense, and those costs reduce available coverage. If the Trustee were required to pursue the D&O Claims in litigation, a significant number of the Directors and Officers would be sued. It is very likely that conflicts or potential conflicts would exist among the defendants, requiring the engagement of multiple different defense counsel and rapidly eroding the Policy limits. Accordingly, if the Trustee were to ultimately prevail in litigation, the estates would not only bear the costs of prosecuting the action(s), their potential recovery would be reduced by all costs of defense, which would undoubtedly be considerable.

47.     Another significant factor to consider is the fees that will be payable to the Trustee's

counsel out of any recovery. The Trustee has engaged special litigation counsel, which is entitled to reimbursement of costs and expenses and a contingent fee equal to: (a) twenty-five percent (25%) of any recovery realized prior to the commencement of litigation; or (b) thirty-five percent (35%) of any recovery realized after the commencement of litigation. See Application to Retain and Employ DGW Kramer LLP as Special Litigation Counsel [D.I. 21], and Order Authorizing Jeoffrey L. Burtch, Chapter 7 Trustee, to Retain and Employ DGW Kramer LLP as Special Litigation Counsel to the Trustee Pursuant to 11 U.S.C. §§ 327, 328, 330, and 331 and Fed. R. Bankr. P. 2014 [D.I. 27]. By resolving the D&O Claims before the initiation of litigation, the Trustee will not only avoid the substantial costs and expenses associated with litigation of this type, he will also reduce professional fees by ten percent (10%).

48.     With all of the foregoing issues and considerations in mind, the Trustee now seeks Bankruptcy Court approval for the Settlement Agreements.

## RELIEF REQUESTED

49.     By and through this Motion, the Trustee seeks entry of an order, substantially in the form of the proposed order attached hereto: (a) approving the Settlement Agreements; (b) approving the sale of the Policy to Great American as provided in the Great American Settlement Agreement; and (c) granting related relief.

50.     In connection with the relief sought herein, the Trustee further seeks approval of his determination that the entirety of the net proceeds realized through the Settlement Agreements should be allocated to the Prodigy Network estate.

**A. Approval of Settlement Agreements**

51.     Bankruptcy Rule 9019 governs the approval of compromises and settlements, and provides as follows:

On motion by the Trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019.

52. The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also Matter of Penn Central Transp. Co*., 596 F.2d 1102, 1113 (3d Cir. 1979) ("In administrating reorganization proceedings in an economical and practical matter it will often be wise to arrange the settlement of claims . . . .") (internal citation marks and quotation marks omitted).

53. In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] [it]self of all facts necessary [to form] an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated, [and] estimate . . . the complexity, expense and likely duration of such litigation . . . all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Matter of Penn Central Transp. Co.*, 596 F.2d at 1114; *see also In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (describing the "ultimate inquiry to be whether the compromise is fair, reasonable, and in interest of the estate") (internal citations and quotation marks omitted).

54. The United States Court of Appeals for the Third Circuit has enumerated four factors that should be considered in determining whether a compromise should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Myers v. Martin* (*In re Martin)*, 91 F.3d 389, 393 (3d

Cir. 1996) (*citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)); *accord In re Nutraquest, Inc.,* 434 F.3d 639, 644 (3d Cir. 2006).

55.     In making its decisions, the bankruptcy court should not substitute its judgment for that of the trustee.  The court is not to decide the numerous questions of law or fact raised by the litigation, but rather should evaluate the issues to determine "whether the settlement fall[s] below the lowest point in the range of reasonableness."  *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983) (internal citations and quotations omitted); *see also In re World Health Alternatives, Inc.*, 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the range of litigation possibilities") (internal quotation marks and citations omitted).

56.     In passing upon the reasonableness of a proposed compromise, the Court "may give weight to the opinions of the Trustee, the parties and their counsel in determining the reasonableness of the proposed settlement."  *In re Bell & Beckwith*, 77 B.R. 606, 612 (Bankr. N.D. Ohio), *aff'd*, 87 B.R. 412 (N.D. Ohio 1987); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other") (internal citations omitted).

57.     The Trustee believes that the Settlement Agreements rise well above the "lowest point in the range of reasonableness."  Additionally, as discussed more fully below, each of the applicable *Martin* factors weighs heavily in favor of the Settlement Agreements. The Court should

therefore approve the Settlement Agreements pursuant to Bankruptcy Rule 9019 and applicable law.

### i. Great American Settlement Agreement

**Consideration of the probability of success in litigating the D&O Claims weighs in favor of approval of the Great American Settlement Agreement.**

58.     While the Trustee believes that there is more than a plausible possibility of success on at least a portion of the D&O Claims if litigation were to be commenced, the outcome of such litigation can never be certain.  The claims resolved by the Great American Settlement Agreement involve difficult questions of state law regarding directors' and officers' duty of care, and whether and to what extent the Debtors were harmed by the actions or inaction of the Directors and Officers.

59.     Particularly given the death of Mr. Niño, who had far more knowledge regarding management of the Prodigy Enterprise than any other person, there might be serious evidentiary obstacles to carrying the burden of proof necessary to prevail on the D&O Claims. The risks inherent in litigation of the D&O Claims more than justify the discount that the Trustee is taking on what theoretically might be collected under the Policy.

**Absent settlement, there would likely be significant difficulties in collection on account of the D&O Claims.**

60.     In the absence of recovery from available insurance, it is likely that the Trustee would experience significant difficulties enforcing any judgments that might be entered on account of the D&O Claims. The Directors and Officers are, obviously, all individuals, and there are nearly invariably complications in collecting from natural persons. Some of the Directors and Officers may have financial means, but there can be no certainty that their financial situations would not deteriorate over the years of litigation that would be necessary before judgments were entered.

61.     Another significant impediment to collection from the Directors and Officers personally lay in the fact that Mr. Niño, who had the most responsibility for any mismanagement

that occurred, is deceased. Upon information and belief, there is no probate proceeding, and there is no readily apparent means of collecting on any claim against Mr. Niño.

62.     In this case, the only certain source of recovery is the insurance coverage maintained by the Debtors, and the best way of maximizing the recovery is to settle claims under the Policy before the policy limits are further eroded by reason of defense costs. Approval of the Great American Settlement Agreement is the best way to achieve that.

**Consideration of the complexity of litigation involved, and expense, inconvenience, and delay necessarily attending such litigation weighs heavily in favor of approval of the Great American Settlement Agreement.**

63.     Litigation involving claims based on breach of duty by directors and officers is invariably complicated and time-consuming. The D&O Claims would all involve complex legal and factual issues, potentially necessitating years of litigation and appeals. Among other things, litigation would be expensive for the estates and would significantly erode the Policy through the accrual and payment of defense costs for multiple defendants. The proposed settlement avoids these problems in favor of a prompt and efficient resolution without the need to expend further resources, much to the benefit of the estates.

**Approval of the Great American Settlement Agreement will serve the paramount interest of creditors.**

64.     The Great American Settlement Agreement serves the paramount interest of creditors. Resolution of the claims under the Policy on the proposed terms represents a successful outcome for creditors by obviating the need for potentially protracted litigation, and the fees and expenses necessarily attendant to such litigation. The fourth *Martin* factor is therefore satisfied and weighs heavily in favor of approval of the Settlement Agreement.

65.     Based on the foregoing, the Trustee submits that approval of the Great American Settlement Agreement is in the best interests of the estates and creditors because it eliminates the

risk that there would be no recovery from the Policy on account of the D&O Claims, and reduces the possibility of any protracted litigation with the settling parties. Approval of the Great American Settlement Agreement will also ease the administrative burden on the estates and provide for a certain, meaningful recovery in the amount of $3 million.

### ii. Capkanis Settlement Agreement

66.     Analysis of the Capkanis Settlement Agreement does not fit neatly within the *Martin* framework, as it is dealing with claims against a debtor and estate, whereas the *Martin* factors are more geared toward claims that the estate might assert against third parties. The single *Martin* factor that should determine whether or not the agreement should be approved is whether the settlement serves the paramount interests of creditors.

67.     In evaluating the Capkanis Settlement Agreement, it is critical to remember that there can be no Great American Settlement Agreement without the Capkanis Agreement. Great American has made it absolutely clear that there could be no settlement unless it were released from any and all potential future liability under the Policy. Because Ms. Capkanis had asserted that she has the right to assert a direct claim against Great American under New York law, settlement of her claims is essential.

68.     Whether or not Ms. Capkanis would have the right to pursue claims directly against Great American is of no significance in this evaluation. The fact is that Great American had concerns about having to litigate that issue if the Capkanis Claims were not settled, and made the settlement a condition.

69.     Accordingly, the Capkanis Settlement Agreement should not be considered as a stand-alone agreement. It is part and parcel of the Great American Settlement Agreement, and the value that will be realized under the Great American Settlement Agreement is more than

enough to justify the minimal cost that might be associated with the Capkanis Settlement Agreement.

### B. Approval of the Sale of the Policy to Great American

70.     Because the Great American Settlement Agreement provides for an insurance policy buyback, or the sale by the Debtors of the Policy free and clear of liens and other interests, the Trustee must also establish grounds for relief under Section 363(b) and (f) of the Bankruptcy Code.

71.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."[8]  Courts have held that proposed sales of property pursuant to section 363(b) should be approved upon a finding that the decision to enter into the transaction represents a reasonable business judgment.  *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

72.     The Trustee believes that the decision to sell the Policy back to Great American is a prudent and proper exercise of the Trustee's business judgment and is supported by sound business reasons.

73.     For reasons described above, after weighing all of the relevant factors, the Trustee

---

[8] There is no reasonable dispute that the Policy is property of the bankruptcy estate. *See, e.g., Acands, Inc. v. Travelers Cas. and Sur. Co.*, 435 F.3d 252, 260 (3d Cir.2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate").

has reasonably determined that approval of the Settlement Agreements is in the best interests of the estates, and it is an essential term of the Great American Settlement Agreement that Great American be released from all further liability on account of the Policy. The sale of the Policy is merely one means of effecting the release, and the Great American Settlement Payment represents a reasonable determination of the value of the Policy to the estates.

74.     Because approval of the Great American Settlement Agreement is appropriate, the sale of the Policy is necessarily also appropriate. Indeed, from the perspective of a trustee or a bankruptcy estate, in most cases there is no material difference between settlement of a claim and a sale of the claim. *See In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 n. 7 (Bankr.N.D.Ill.1994) ("The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim. There is no difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with an adverse party.").[9]

75.     The Great American Settlement Agreement further provides that the sale of the policy must be free and clear of any interest or right in the Policy, with such interests and rights, if any, attaching to the proceeds of the sale. The Trustee therefore requests that the sale be free and clear of all liens, claims, rights, and encumbrances.

76.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

---

[9] Pursuant to Local Rule 6004-1(b)(iv), the Trustee makes the following disclosures: (a) Great American will be released from all claims arising out of or related to the Policy (6004-1(b)(iv)(C)); (b) No auction will be held, and the Trustee is not seeking competing bids for the Policy (6004-1(b)(iv)(D)); (c) $164,500.00 of the Great American Settlement Payment will be used to fund the Capkanis Settlement Payment (6004-1(b)(iv)(H)).

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

77.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any one of the elements would permit sale of the Property free and clear of all liens, claims, rights, and encumbrances, *See, e.g., Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

78.     The Policy may be sold free and clear of all interests pursuant to Section 363(f)(2), (f)(4), and (f)(5). Section 363(f) authorizes a sale free and clear of "interests," not merely liens, and thus permits a sale of property free and clear of all claims and interests of any entity that "are derivative of the debtors' rights in that property." *See In re Dow Corning Corp.*, 198 B.R. at 244; *In re Johns-Manville Corp.*, 837 F.2d at 94 (claims of coinsured party and direct action of asbestos claimants could be channeled to the proceeds of insurance settlement).

79.     As an initial matter, the Trustee has taken steps to give notice of the Motion to any party who might reasonably be expected to have an interest in the Policy. To the extent that any parties who receive notice of the Great American Settlement Agreement fail to object, such parties should be deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2). *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (For purposes of Section 363(f), creditor "consented to the sale by failing to make any timely objection after receiving notice of the sale."); *In re Junk*, 566 B.R. 897, 916 (Bankr. S.D. Ohio 2017) ("Failure to object by any party that received notice of the Motion constitutes consent within the meaning of § 363(f)(2) to the sale free and clear.") (citing *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002)).

80.     To the extent any objections are filed, the Policy may still be sold free and clear of all interests pursuant to Section 363(f)(5).[10] Under Section 363(f)(5), property of the estate can be sold free and clear of an interest of any entity if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." There is no question that, to the extent that any party might assert a right to coverage or recovery under the Policy, such party could be compelled to accept a money satisfaction on account of such interest. Indeed, payment of money is the entire purpose of insurance of the type at issue here – the insurer's obligations are essentially limited to the payment of money. Accordingly, the Policy can be sold as contemplated in the Great American Settlement Agreement pursuant to Section 363(f)(5).

81.     Finally, to the extent that any party objects to the Motion on the grounds that such party has some rights under or interest in the Policy, the Court can nonetheless approve the sale, but whatever rights that party may have will attach to the proceeds realized under the Great American Settlement Agreement. The interest of any party objecting to the Motion will therefore be adequately protected pursuant to Section 363(e).[11]

## C. Supplemental Injunction

82.     Under the Great American Settlement Agreement the Trustee is required to seek entry of an approval order that provides, in relevant part, that

> (i) all Persons who hold or assert, or may in the future hold or assert, any claim against an Insured, arising in connection with any activities covered by the Policy, or in connection with the Insureds' activities giving rise to the claims made or to be made under the Policy, or (ii) any other Person who may claim to be an insured, additional insured, or otherwise entitled to any benefit or recovery, directly or

---

[10] The Trustee further submits that any parties that might assert any rights under or interest in the Policy should be deemed to have waived their rights if they fail to object to this Motion. *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 265 (3d Cir. 2000).

[11] Section 363(e) provides, in relevant part, that "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest…"

indirectly, from or under the Policy, are permanently stayed, restrained, and enjoined from asserting any such claim, right or entitlement, commencing a proceeding, or taking any other action against Great American for the purpose of obtaining any recovery or other relief from Great American or under or in connection with the Policy.

Exhibit A, Great American Settlement Agreement, § V(2).

83.     In the context of a settlement with an insurance carrier that includes a policy buy-back, an injunction of the type described above is appropriate. As a practical matter, the proposed injunction does little more than clarify the effect of the releases that are provided for as part of the settlement of claims, and further ensure that Great American will take title to the Policy free and clear of *any* interest of any of the enjoined parties. The injunction, therefore, is "necessary or appropriate to carry out the provisions of" Section 363(f), and within the scope of the Court's authority under Section 105(a):

> Courts have long recognized that inherent within the authority to sell estate property free and clear of liens is the power to enjoin creditors from pursuing the purchaser of such property. *See Whitehead & Kales Co. v. Dempster (In re Wiltse Bros. Corp.),* 361 F.2d 295, 299 (6th Cir.1966). Nevertheless, more explicit protection is often needed to effectuate this important aspect of a § 363 sale. In other words, an actual injunction barring creditors from suing a purchaser of estate assets is sometimes necessary and appropriate to give the "free and clear" aspect of § 363(f) meaning. When this is the case, a court has the power to "issue an [ ] order ... necessary or appropriate to carry out [§ 363(f), one of] the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a). *See, e.g., WBQ Partnership,* 189 B.R. at 110; *cf. MacArthur,* 837 F.2d at 93–94; *PKR Convalescent Centers,* 189 B.R. at 96…

*In re Dow Corning Corp.*, 198 B.R. 214, 245 (Bankr. E.D. Mich. 1996).

84.     To give full effect to the Great American Settlement Agreement, and the sale free and clear as provided therein, the Court should exercise its equitable power under Section 105(a) to enjoin parties that might otherwise assert some right under, or interest in, the Policy from

asserting or seeking to enforce such right or interest against Great American or the Policy.[12]

## D. Approval of the Proposed Allocation of Settlement Proceeds

85.     Finally, the Trustee requests that the Court approve the Trustee's determination that the entirety of the net proceeds of the Great American Settlement Agreement should be allocated to, and be deemed the sole property of, the estate of Debtor Prodigy Network, LLC (Case No. 21-10622).

86.     The allocation determination is appropriate in the circumstances of these cases for a number of reasons, including, but not limited to, the following:

   a.     Given the lack of clearly identified directors, officers, or other agents of substantially all other entities making up the Prodigy Enterprise, it appears that the conduct giving rise to the D&O Claims took place primarily at the Prodigy Network level;

   b.     While other entities may have suffered compensable damages, it appears that investors in many projects (and therefore holders of interests in many different entities) have filed proofs of claim in the Prodigy Network case;

   c.     A precise, objective allocation of damages among the entities that might have covered claims against the Directors and Officers may not be possible, and would be exceedingly complicated and costly; and

   d.     Virtually all creditors that have filed claims in any of the Debtors' cases, filed claims in the Prodigy Network case.[13]

87.     In cases involving numerous affiliated debtors, the appropriate allocation of damages that might have been suffered by reason of the actions or inactions of management can be a very difficult problem.

88.     In the present case, the most reasonable and equitable way of addressing this

---

[12] As noted above, such parties' rights and interests, if any, will attach to the proceeds of the sale of the Policy and may be asserted in the Bankruptcy Cases subject to all relevant provisions of the Bankruptcy Code, Bankruptcy Rules and applicable non-bankruptcy law.

[13] 1,826 claims have been filed in the Prodigy Network case. The number of claims filed in the other cases ranges from 65 to 134. Out of the claims that were filed against Debtors other than Prodigy Network, only nine were not also filed in the Prodigy Network case.

problem is by concentrating all of the settlement proceeds in the estate of the Debtor that was apparently at the center of substantially all management decisions. Not only is this the estate that most certainly suffered the greatest damage, it is also the estate against which virtually all claims have been filed.

89.     By allocating all of the net proceeds from the Settlement Agreements to the Prodigy Network estate, the Trustee will most be able to administer the assets in a way that is both most efficient and most equitable.

## <u>NOTICE</u>

90.     The Trustee has provided notice of this Motion to:

    a.     The United States Trustee;

    b.     Counsel for Great American;

    c.     Counsel for Ms. Capkanis;

    d.     The Directors and Officers;

    e.     Shorewood Real Estate Group and S. Lawrence Davis;

    f.     All known Insureds (as defined in the Policy);

    g.     The Debtors and counsel for the Debtors;

    h.     The Hartford;

    i.     All creditors that have filed claims in any of these cases;

    j.     All parties with claims appearing on the Debtors' schedules;

    k.     All individuals who are reasonably believed to be among those who might assert any rights under or interest in the Policy; and

    l.     All parties who have appeared in these Bankruptcy Cases or requested notice pursuant to Bankruptcy Rule 2002.

The Trustee is also providing national publication notice of this Motion in the Wall Street Journal at a cost not to exceed $10,000.

## **CONCLUSION**

WHEREFORE, the Trustee respectfully requests that this Court enter the attached

Proposed Form of Order granting the Motion, approving the Settlement Agreements on the terms

proposed herein and granting such other and further relief as may be just and equitable.


Dated:  October 17, 2022                    COZEN O'CONNOR

                                            */s/ Mark E. Felger*
                                            Mark E. Felger (No. 3919)
                                            Gregory F. Fischer (No. 5269)
                                            1201 N. Market Street, Suite 1001
                                            Wilmington, DE 19801
                                            Telephone: (302) 295-2000
                                            Fax: (302) 295-2013
                                            Email: mfelger@cozen.com
                                            gfischer@cozen.com

                                            *Attorneys for Jeoffrey L. Burtch,*
                                            *Chapter 7 Trustee*