# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Prodigy Network, LLC, *et al.*,[1] | Case No. 21-10622 (JTD) |
| Debtors. | **In Response to: Docket No. 190** |

Matías Valentín Castellano ("Movant" or "Plaintiff"), acting *per se*, hereby objects to the Motion for Order filed on October 17, 2022, by Jeoffrey L. Burtch, the duly appointed Chapter 7 Trustee (the "Trustee") for the estates of the above-captioned debtors (the "Debtors"), by and through his counsel, for entry of an order: (I) approving certain Settlement Agreements pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (II) approving the sale of an insurance policy to the insurer; and (III) granting related relief (the "Trustee's Motion"[2]).

Unless otherwise indicated, the following terms are defined as in the Trustee's Motion: "Great American"; "Policy"; "Bankruptcy Court"; "Directors and Officers (D&O)"; "Capkanis' Claims"; "Settlement Agreements"; "Great American Settlement Amount"; "Great American Settlement Agreement"; "Capkanis Settlement Payment"; "Capkanis Settlement Agreement"

## I. OBJECTION AND REQUEST

1. Movant hereby re-asserts his claims against the Directors and Officers of the Debtors and, in this regard, asserts his rights under the Policy.

2. Movant hereby respectfully objects to the Sale Motion in the terms and conditions that have been set in the Settlement Agreements as an incorporation of the Policy to the estate under those terms and conditions would violate the fairness and equity principles since a particular creditor (Ms. Emily Capkanis) would be benefit to the detriment of other creditors in her same situation, that is

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each case follows in parentheses): 1234 W. Randolph Realty Associates LLC (21-10612-JTD), Prodigy Shorewood Master Rep Fund LLC-1234 W Randolph Series (21-10613-JTD), 1234 W Randolph Newco, Inc. (21-10614-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC-1234 W Randolph Series (21-10615-JTD), 1400 N Orleans Realty Associates LLC (21-10616-JTD), Prodigy Shorewood Master Rep Fund LLC-1400 N. Orleans Series (21-10617-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC- 1400 N Orleans Series (21-10618-JTD), 1400 N Orleans Newco, Inc. (21-10619-JTD), Prodigy Network Miami, LLC (21-10620-JTD), The Assemblage Hospitality, LLC (21-10621-JTD), and Prodigy Network, LLC (21-10622-JTD).

[2] Docket number 190

1

to say, creditors whose claims against the D&O have been validated -either by Court judgments outside of this bankruptcy case or by the discoveries within the present bankruptcy case- and who have asserted their rights against the Policy. One of the fundamental policies of the Bankruptcy Code is that similarly situated creditors receive similar treatment.

3. Movant hereby respectfully requests that, in order to repair the unfairness and inequity to similarly situated creditors, the Settlement Agreements are renegotiated with the purpose of eliminating the Capkanis Settlement Agreement and the Capkanis Settlement Amount, thus only preserving the Great American Settlement Agreement and the Great American Settlement Amount.

4. Should that renegotiation be deemed impossible by the Bankruptcy Court and it decides to approve the Settlement Agreements proposed by the Trustee, in order to nevertheless protect the said principles of fairness and equity by avoiding the arbitrary benefit to a single creditor, Movant respectfully requests the entry of an order, substantially in the form of the Proposed Order attached hereto as Exhibit A, that will allow all creditors who have validated claims against the D&O and who have asserted their rights against the Policy in the terms requested in the Trustee's Motion, to receive full liquidation of their claims out of the proceeds realized by the estate under the Policy. Or, if those proceeds were insufficient to fully compensate the claims of each one those claimants, to liquidate their claims on pro rata bases out of those proceeds, in which case those claimants reserve the right to keep participating as creditors in this bankruptcy case with a liquidated claim against the Debtors and their estates. This will fairly equate creditors based on similar conditions.

5. For the ease of reference, it is noted that the Proposed Order specifically mends §1, §4 and §7 of the Proposed Form of Order attached to the Trustee's Motion.

## II. FACTUAL BACKGROUND

6. On August 4, 2021, as an investor in Prodigy Network's AKA Wall Street project, Movant asserted a Proof of Claim against the D&O (#112) for an unsecured claim in the amount of $ 100,000 ("Movant's Proof of Claim" – Exhibit B attached to this Objection). In the "RIDER TO PROOF OF CLAIM" attached to that submission, Movant points out different business practices of the Debtors which fall under the category of wrongful acts and omissions ("mismanagement"; "irresponsible financial operations"; "questionable business practices"; "fraudulent Ponzi-like scheme"; "no intention of repaying creditors"; "fraud and misrepresentation"; "breach of

contract, breaches of fiduciary duties, fraud, defalcation, and intentional misrepresentation") which would be acts covered under the Policy.

7. In Movant's Proof of Claim, it is also stated that "(t)he filing of this Proof of Claim is not: a. a waiver or release of: (1) any right to claim specific assets; (2) any right of setoff, recoupment or counterclaim; (3) any right arising by operation of law or in equity; or (4) the Claimant's rights against any person, entity, or property; b. a waiver or release of any right or claim of the Claimant arising out of, or in respect of, any order entered in these cases, or of any other claim, of any nature whatsoever, which the Claimant has against the Debtors, their estates or any other person or entity".

8. In the same line, in the Trustee's Motion, it is said with regards to the merits of the D&O Claims "(...) it appears that there are grounds to allege that the Directors and Officers (and the Debtors) engaged in a number of wrongful acts and omissions" (§ 23) and "(...) that **some or all of failures of the Directors and Officers described above may constitute wrongful acts giving rise to coverage under the Policy**[3]. On or about September 10, 2021, therefore, the Trustee (...) gave Great American notice of circumstances that there may be grounds to assert claims under the Policy" (§ 24, **emphasis** added). The Trustee has expressed to believe that "there is **more than a plausible possibility of success** on at least a portion of the D&O Claims" (§ 58, **emphasis added**).

9. The discoveries of the Trustee confirmed the claims that Movant had alleged in the Movant's Proof of Claim against D&O. More importantly, the Trustee specifies that there is a certain Policy, concludes that there are grounds to assert that type of claims under that Policy and sets a deadline on November 15, 2022, for parties who have a right to recovery under the Policy to assert those rights.

If the Trustee's Motion is approved by the Court, creditors will be permanently stayed, restrained and enjoined from asserting claims, right or entitlement, commencing a proceeding, or taking any other action against Great American and/or the D&O for the purpose of obtaining any recovery or other relief from Great American under the Policy with regards to the Insured's activities.

---

[3] The Insurance Policy is a "Private Equity Liability Insurance". Its definition of Wrongful Act includes "any actual or alleged Employment Practices Wrongful Act or an actual or alleged error, misstatement, misleading statement, act, omission, or neglect or breach of duty, or any actual or alleged error or omission in the rendering or the failure to render Professional Services...".

The Policy, and any and all of the Insureds' rights and interests in the Policy, will be deemed to have been sold back to Great American pursuant to sections 363(b) and (f) of the Bankruptcy Code free and clear of any interest or right in the Policy, with such interests or rights attaching to the Settlement Payment in accordance with their respective priorities.

10. The Policy Period was in due course extended to 09/06/2023 and is, therefore, currently valid until further notice.

11. On October 25, 2022, Movant sent an e-mail to Great American in order to assert that Movant have grounds to make a claim against Prodigy Network's D&O under the Policy, and to request instructions on how to file his claim. The Trustee's counsel was copied.

12. Great American replied that the Policy is a third party policy and that claim notices can only be submitted by an Insured as defined in the Policy. The insurer added that unless or until it receives notice from an Insured of a Claim made against them, it will take no further action. A copy of my e-mail and the response from Great American is attached to the present objection for further reference (Exhibit C attached to this Objection).

### III. BASIS OF THE OBJECTION AND REQUEST

### III.I GENERAL STANDARDS TO APPROVE A SETTLEMENT UNDER RULE 9019: FAIRNESS AND EQUITY

13. A bankruptcy court may approve a settlement under Bankruptcy Rule 9019 when "it is supported by adequate consideration, is fair and equitable, and is in the best interests of the estate."[4].

14. Two sets of questions have arisen as to a) what standard bankruptcy judges must follow in deciding whether to approve a trustee's Rule 9019 settlement proposal over the objection of other unsecured creditors, and b) whether a bankruptcy judge can ever approve a settlement when it adversely affects rights of parties not involved in the settlement negotiations[5].

15. The standards set out by the Supreme Court and Second Circuit limit a bankruptcy judge's discretion.

---

[4] In re Ionosphere Clubs, Inc., 156 B.R. 414, 426 (S.D.N.Y. 1993), aff'd, 17 F.3d 600 (2d Cir. 1994) (quoting TMT Trailer Ferry, Inc., 390 U.S. at 424)
[5] *In re* Miami Metals I, Inc., 603 BR 531, 531 (Bankr. S.D.N.Y. 2019).

*The Supreme Court's Fair and Equitable Standard*

16. When assessing a settlement agreement made under Rule 9019, the court must "make an informed and independent judgment as to whether a proposed compromise is "fair and equitable"[6]. The Supreme Court has instructed that a bankruptcy judge should form an educated estimate of the "complexity, expense, likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a **full and fair assessment of the wisdom of the proposed compromise**"[7]. (**emphasis** added)

17. Both the Fifth and Second Circuits interpreted the phrase "fair and equitable" to be derived from section 1129(b)(2)(B)(ii) of title 11 of the United States Code (the "Bankruptcy Code"), which sets the conditions under which a plan of reorganization may be approved notwithstanding the objections of an impaired class of creditors[8].

18. The derivation of that is that "a settlement presented for approval as part of a plan of reorganization, because it constitutes part of the plan, may only be approved if it, too, is 'fair and equitable' in the sense of conforming to the absolute priority rule"[9]. This rule states that senior creditors must be paid in full before junior creditors are paid, unless the former consent to subordinate their claims to the latter[10].

19. However, when a settlement is brought for consideration outside of a reorganization plan, section 1129 does not provide statutory language. In order to provide all unsecured creditors proper protection, both the Fifth and Second Circuits have implemented tests that reflect the relevance of the absolute priority rule in a bankruptcy judge's fairness and equitability analysis[11]. The Fifth Circuit requires that the absolute priority rule is applied to pre-plan settlements; however, the Second Circuit found that approach to be too rigid and, even if it denied to adopt a per se rule, the court noted that rejection of a per se rule creates an increased risk that the parties to a settlement may engage in "improper collusion"[12].

---

[6] *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)
[7] *Id.*
[8] *In re* Iridium Operating LLC, 478 F.3d at 462; 11 USC § 1129(b)(2)(B)(ii) ("the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.").
[9] *See* TMT Trailer Ferry, 390 U.S. at 424; *In re* Iridium Operating LLC, 478 F.3d at 463.
[10] 11 U.S.C. § 1129(b)(2)(B)(ii).
[11] *In re* Iridium Operating LLC, 478 F.3d at 463-65
[12] *Id.* at 464

In fact, in *In re Iridium Operating LLC*, the Second Circuit held that a bankruptcy court may approve a settlement that does not fully comply with the absolute priority rule if other factors weigh in favor of approval and the parties give sufficient justification[13]. In Chapter 11 cases, whether the settlement complies with the Bankruptcy Code's priority requirements is the most significant factor in deciding whether that settlement is fair and equitable, although it is not dispositive[14]. A creditor's committee has a fiduciary duty to maximize recovery for the estate and, if in doing so it reaches a settlement that impairs the rule of priorities, then it must state "specific and credible grounds to justify the deviation"[15].

20. The same principles apply to settlements made under a Chapter 7 case as part of the asset recovery process. In this regard, if the Trustee and/or the Court somehow impair the rule of priorities, either by inversing the priority of senior creditors over junior creditors or by creating a special sub-class of creditors who will receive a differentiated treatment –as it is being proposed with the Capkanis Agreement–, then, the "deviation" of the rule of priorities cannot be arbitrary and must be grounded, universal and fair.

21. In turn, the U.S. District Court for the District of Delaware has described that the ultimate inquiry of the bankruptcy court must be whether "the compromise is **fair**, reasonable, and in the interest of the estate"[16]. (**emphasis** added)

22. There is no stipulation in the law from where it could be, directly or indirectly, inferred that Ms. Capkanis deserves a special treatment of her claims. If there will be a deviation from the rule of priorities, then a fair and equitable reasoning for doing so must be provided and that deviation should be fairly and equitably applied to all creditors who are in similar conditions.

*Rule 9019 Requires Settlements to be Fair and Equitable to Non-Settling Parties*

23. "Where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval... [I]f third parties complain to a judge that a decree will be inequitable because it will harm them unjustly, he cannot just brush their complaints aside"[17].

---

[13] *In re* Iridium Operating LLC, 478 F.3d at 465.
[14] *Id.* at 464.
[15] *Id.* at 466.
[16] In re Louise's, Inc., 211 B.R. 798, 801. D.Del.1997.
[17] *In re* Masters Mates & Pilots Pension Plan & IRAP Litig., 957 F.2d 1020, 1026 (2d Cir. 1992).

24. The Second Circuit has made it clear "that when the rights of non-settling parties are implicated by the terms of a settlement, the court cannot approve it without considering the interests of those non-settling parties"[18].

25. In *In re Miami Metals I, Inc.*, a New York bankruptcy court held that a settlement could not be approved because it adversely affected rights of non-parties thereto[19]. In that case, Miami Metals I, Inc. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code[20]. The official committee of unsecured creditors (the "Creditors' Committee") and the senior lenders agreed on terms of a settlement, which required entry into a Plan Support Agreement ("PSA")[21], and requested bankruptcy court approval of the settlement under Rule 9019[22]. However, a separate group of unsecured creditors who were not part of the Creditors' Committee and, therefore, not signatories to the PSA objected the PSA[23].

As a result of the objection, the court denied the motion to approve the PSA because of: (i) the potential prejudice to the unsigned parties' rights, and (ii) the timing of the benefits under the settlement[24].

Accordingly, the court declined to approve the settlement because it would not be "fair and equitable" under Rule 9019 and because non-settling parties would be unduly harmed.

26. On another note, Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate". *In In re Phoenix Steel Corp.*, 82 B.R. 334, 335, the Court states that the elements necessary for approval of a section 363 sale are "that the proposed sale is **fair and equitable**, that there is a good business reason for completing the sale and the transaction is in good faith". (**emphasis** added)

---

[18] Stanwich Fin. Servs. Corp. v. Pardee (*In re* Stanwich Fin. Servs. Corp.), 377 B.R. 432, 437 (Bankr. D. Conn. 2007) (citing *In re* Drexel Burnham Lambert Grp., 995 F.2d 1138, 1146-47 (2d Cir. 1993).
[19] *In re* Miami Metals I, Inc., 603 B.R. at 531.
[20] *Id*.
[21] *Id*.
[22] *Id* at 532.
[23] *Id*.
[24] *Id* at 532.

## III.II THE SETTLEMENT AGREEMENTS CREATE AN UNFAIR AND INEQUITABLE DISTRIBUTION OF ASSETS

27. The Settlement Agreements create an unfair and inequitable distribution of assets that, if not corrected, will benefit one particular creditor, Ms. Capkanis, whose claims will be fully satisfied via those Settlement Agreements in detriment of the rest of creditors who also have valid and verified claims against to D&O and who asserted their rights against the Policy.

28. The Capkanis' Claims do not appear to have any element from which it could be derived that they deserve any priority over the rest of the claims in this bankruptcy case: **a)** the claims are unsecured; **b)** the Federal Court of Action default judgment in favor of Ms. Capkanis[25] did not *per se* allowed her to directly assert rights to Great American under the Policy due to the permanent stay; **c)** the Motion for Relief from Stay that Ms. Capkanis filed with the Court to ultimately seek recovery under the Policy (the "Capkanis' Motion for Relief from Stay"), was never granted (and the Trustee actively objected several times); **d)** even if it was argued that the default judgment is a judgment by the merits that validated her claims against the Debtors, that should not entitle her to any special treatment in terms of access to the proceeds of the Policy over other creditors who also have proved and validated their claims against the D&O and who asserted their rights against the Policy; **e)** that judgment is not the only judgment that creditors have obtained against the Debtors and it lacks any specific merit to it that could be considered as entitling Ms. Capkanis to any special treatment in terms of recovery; **f)** there is no stipulation in the Policy nor in the applicable law from where it could be reasonably concluded that it must be awarded any priority to Capkanis' Claims, which are employment related, over business related claims; **g)** and finally, the Capkanis' Claims do not hold any special risk to Great American as the policy would only pay for defense costs and compensatory damages and not any associated punitive charges which is what any creditor who has a claim against the Policy would also receive.

29. As the Trustee explains in the Trustee's Motion, the only reason why Capkanis' Claims are being offered a differentiated treatment in terms of recovery under the Policy is because of a seemingly unfounded "concern" that Great American has with regards to the claims that Ms. Capkanis has asserted under the Policy, a "concern" that has taken the insurer to the point of putting the settlement of the Capkanis' Claims as a condition for any settlement and, by extension, a "concern" that is originating such an unfair and inequitable distribution of assets for all creditors,

---

[25] Emily Capkanis v. Prodigy Network LLC, Case No. 20 Civ. 07144 (CM) (GWG), Southern District of New York. The Court found liability as to Prodigy regarding employment related practices at the time when she was employed by the company.

in general, and for those in the same conditions as Ms. Capkanis with regards to the Policy, in particular.

*With the current Settlement Agreements, Ms. Capkanis is being greatly benefited in comparison to probably any other individual creditor*

30. In any bankruptcy case, where the interest of creditors is paramount, the fairness and equity of a settlement must be evaluated and measured in terms of how fair and equitable the distribution of the assets is from the point of view of the creditors individually. With the current Settlement Agreements, without any universal standard having been applied in order to establish distinctions between classes and/or subclasses of creditors, one single creditor who has an unsecured claim of no particular specificity as discussed in § 27 above would be receiving an amount which will be substantially higher in absolute terms than any other creditor will receive on a pro rata basis in view of the excessively high amount of claims in the present case. This in addition to the nearly a decrease of 5.2% in terms of what the estates would receive as net benefit compared to what it would receive if the $ 164,500 being attributed to Ms. Capkanis under the Capkanis Settlement Payment would be allocated to the estate itself. In effect, Ms. Capkanis is receiving the full amount of any claim she may have while other similarly situated creditors will receive pennies on the dollar for their claims.

31. A comparison is not possible in relative terms (as a percentage of the amounts lost by the investors and lenders with the bankruptcy of the Debtors) since the damages that Ms. Capkanis suffered are not of a monetary, but of a personal nature. To the best of my knowledge and belief, the amount that Ms. Capkanis could claim as liquidated damages in said default judgment has not been set by the court which entered the judgment, so the comparison between what she would receive as part of the Settlement Agreements ($ 164,500) *versus* what she should have received becomes impossible. In any case, however, the recovery that business creditors who actually invested a verified amount of money in the Debtor's companies will receive out of the Settlement Agreements in relative terms –as a percentage of the funds they have lost- will be close to zero (0). Ms. Capkanis, who has invested nothing other than minimal attorney's fees for a quickly won default judgement, will only gain from the bankruptcy of the Debtors.

32. In conclusion, if not corrected, the negative impact of the Capkanis Settlement Agreement on the levels of fairness and equity in the distribution of assets would be far from marginal.

33. In a bankruptcy case, the protection of fairness and equity must be the highest possible that the circumstances allow at a particular moment: if a settlement benefits one creditor in particular and

that situation cannot be corrected without, by doing so, jeopardizing the reasonableness of the settlement itself, the interest of the creditors and the interest of the estate, then the settlement must be considered as having reached the highest possible fairness and equity levels allowed under those particular circumstances; but if the situation can be corrected, but it is not, then the agreement would be unfair and inequitable.

*The Capkanis' Claims do not appear to deserve a special treatment by virtue of its own nature*

34. It is explained in the Trustee's Motion that: "The settlement resolves (...) claims that had been asserted by Emily Capkanis, a former employee, which Capkanis **maintained** were covered by the Policy" (§ 6). (**emphasis** added)

35. In that extract, The Trustee does not acknowledge any reason for special treatment of Capkanis' Claims. In the same line, as it is stated in the Recitals of the Capkanis Settlement Agreement, Great American denies that it is obligated under the Policy to provide coverage for the Employment Practices Claims of Ms. Capkanis.

36. The Trustee's position with regards to the weakness of Capkanis' Claims is set, once again, when he points out that: "**The Trustee believes that there are likely defenses to the Capkanis' Claims**, and that there are **significant questions regarding the availability of coverage for the Capkanis' Claims under the Policy**" (§ 42). (**emphasis** added).

37. The Policy is a general liability policy, which not only covers employment liability, but also business liability as defined above. In this regard, the Policy does not subordinate business related claims to employment related claims, or vice versa.

38. Ms. Capkanis commenced actions against the Debtors before most of the other affected parties in this bankruptcy case simply because the origin of Capkanis' Claims is related to D&O practices in the workspace unrelated to financial downfall of the Debtors which would give rise to the business related claims (eg. the D&O wrongful acts and omissions). The mere chronology of facts giving rise to the different claims cannot justify giving Capkanis' Claims any special treatment over the rest of the similarly situated creditors. Also, it is probable, although Movant cannot be certain, that Ms. Capkanis knew about the existence of the Policy unlike the other creditors, as she had been an employee of the Debtors and had, therefore, access to information that the other creditors did not have. This particular fact of having been able to claim against the Policy ahead of the rest of the creditors for the mere fact of having had access to certain "insider" information should also not be legitimized as giving origins to inequalities among the creditors.

39. The Trustee opposed Capkanis' Motion for Relief from Stay "(...) largely on the grounds that the Trustee was investigating the D&O Claims, and should be **permitted to seek recovery for the benefit of the estate and all creditors before a single creditor is allowed to recover**, and thereby reduce the coverage remaining under the Policy" (Trustee's Motion, § 31). (**emphasis** added)

40. On the contrary, the Trustee considered that claims to the insurer for breach of fiduciary duty and the like had actually priority over claims like Ms. Capkanis'. This is how the Trustee himself puts it in the Trustee's Objection to the Motion of Emily Capkanis for Relief from Stay filed on October 8, 2021 (the "<u>Trustee's Objection to Capkanis' Motion for Relief from Stay</u>"):

    "To the extent that there are covered claims belonging to the Estates, they would primarily consist of claims against individuals, which would have **priority over Capkanis' claims**. (...) Because Capkanis has only named Prodigy as a defendant in her suit, **any payment to her would be subordinated to the claims that the Estates may have based on claims for breach of fiduciary duty and the like**" (footer #3). (**emphasis** added)

    On that occasion, the Trustee also argued that:

    "Whether or not any of the scheduled claims in this case would give rise to coverage under the policy, the estates may very well have claims that are covered. If the estate does have covered claims, **it is the Trustee's duty to maximize recovery for the benefit of all creditors**. We cannot stipulate to allowing any single creditor to assert claims under the policy, because any recoveries would reduce the amount of coverage available, to the detriment of all creditors and the estates" ("I. FACTUAL BACKGROUND", third paragraph). (**emphasis** added)

41. In other parts of the Trustee's Objection, it is stated that:

    "**The potential prejudice to the Estates if the Motion is granted is substantial**. The Estates have potential claims under the Insurance Policy, and allowing Capkanis to liquidate her claim and proceed against the Insurance Policy would **reduce the coverage that might otherwise be available for the benefit of the Estates and creditors generally**.

(...) Prodigy is the only named defendant in the action pending in the Southern District of New York, and if that action were to continue, **the Trustee would likely have no alternative but to engage counsel to try to set aside the Judgment and otherwise defend to ensure that the Estates' interests are protected**" ("II.LEGAL AUTHORITIES", "A.There is substantial risk of prejudice to the Estate", first and second paragraphs). (**emphasis** added)

42. It must also be noted that, in his Objection, the Trustee rejected the idea that Ms. Capkanis could somehow be entitled to receive any special treatment as creditor:

    "The only harm that Capkanis will suffer if the Motion is denied will be that she may have to **wait for distribution from the Estates, as do all other creditors**. One of the fundamental policies of the Bankruptcy Code, however, is that **similarly situated creditors receive similar treatment** (...)" ("II.LEGAL AUTHORITIES", "B. The hardship to the Estates if the Motion were granted considerably outweighs the hardship to Capkanis if the Motion is denied"). (**emphasis** added)

    "While state law issues may predominate on the question of liability in the Capkanis action, **consideration of bankruptcy law is critical to determination of the parties' rights in and to the Insurance Policy**" ("II. LEGAL AUTHORITIES", "D. Additional Factors.", 2). (**emphasis** added)

43. Finally, the fact that the nature of Capkanis' Claims did not call for any special treatment was stressed in the following terms:

    "**Capkanis' claims are fairly common employment law claims** of the same general type that are heard by nearly every state and federal district court in the country" ("II. LEGAL AUTHORITIES", "D. Additional Factors.", 7). (**emphasis** added).

44. In turn, the central arguments given by Ms. Capkanis in response to the Trustee's Objection to her Motion for Relief from Stay ("<u>Capkanis' Objection</u>") filed on October 25, 2021[26], attempting to justify that the nature of her claim allowed her access to the Policy as opposed to the rest of the creditors, have proved to be wrong in view of the ulterior discoveries and assertions of the Trustee: "(...) Movant has demonstrated that the insurance contract does not cover any filed claim except her own"; "(...) her claim is covered by insurance, the trade's claims are not"; "she has a cognizable insured claim. The Trustee does not"; "(...) the Trustee has failed to meet (or even

---

[26] Docket number 100

attempted to meet) his burden of showing that the insurance proceeds are property of the estate protected by the automatic stay"; "The Obj. contends, without demonstrating, that the "estates may very well have claims that are covered."; "The Obj. notes special litigation counsel was retained to pursue recoveries under various theories, "fraud, intentional misrepresentation, breach of fiduciary duty, and fraudulent transfer. The Obj. does not demonstrate that each category of claim is covered by the Insurance Policy. (...); "This Court should not accept without substantiation that there may be more creditors waiting in the wings".

45. In conclusion, the Settlement Agreements seem to legitimize the position of Ms. Capkanis as a "line skipper" who receives a payout ahead of other creditors over whom she does not appear to have any special right by virtue of the nature of her claim nor by any other reason.

*The default judgment in favor of Ms. Capkanis does not contribute in any way, shape or form to giving preeminence to Capkanis' Claims over the rest of the claims*

46. The judgment from the Federal Court Action that favored Ms. Capkanis was a judgment by default. In this regard, as the Trustee puts it in the Trustee's Objection to Capkanis Motion for Relief From Stay: "Prodigy has not appeared in the action, and **Capkanis' factual allegations have not been subjected to any scrutiny by the court or any party in interest**. In support of her Motion, **Capkanis does not actually address the merits of her claims as such**" ("C. Probability of prevailing on the merits", first paragraph). (**emphasis** added)

47. Also, the judgment by default was entered just a few days before the Debtors filed for bankruptcy in March 2021. As Ms. Capkanis herself admits, Prodigy Network probably simply ignored the action against it because it was filing for bankruptcy (see Capkanis Objection). In effect, the company did not have any effective management in place or funds available to retain counsel.

48. It must be remembered that, prior to commencing her action at the United States District Court for the Southern District of New York, Ms. Capkanis had filed in 2019 a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") asserting substantially similar claims to those that she would file with the said District Court a year later. In that first occasion, Prodigy Network did assert defenses to Capkanis' Claims, and, on or about February 26, 2020, the EEOC finally dismissed those Claims stating that it was unable to conclude whether the alleged violations of statutes had actually occurred.

49. All in all, the judgment that Ms. Capkanis obtained in her favor in 2021 cannot be taken as directly and/or indirectly giving any preeminence to Capkanis' Claims over the rest of the similarly situated creditors' claims. Actually, contrary to the rest of the creditors' trade related claims against the D&O, Capkanis' Claims have never been proved.

50. However, Ms. Capkanis appears to be seated at the negotiation table with Great American and potentially benefit from a tailored settlement without any particular merit to her claims. Despite that this situation is explained by the Trustee by the fact that Great American is "concerned" regarding the claims that Ms. Capkanis had asserted under the Policy, that should not preclude the Trustee and/or the Bankruptcy Court to seek remedies to such an unfair and inequitable incorporation of assets to the estate, especially considering, among other factors, that those "concerns" seem arbitrary and unfounded.

51. Also, Ms. Capkanis' default judgment is not the only default judgment that has been entered against the Debtors. During 2019 and 2020, several investors filed civil lawsuits against different Prodigy Network affiliates. No defense was offered in the majority of these suits and that led to a number of defaults.

52. In conclusion, Capkanis' Claims, which have not been proved in substance, could not entitle the claimant to any preeminence in terms of recovery under the Policy over the claims against the D&O from other creditors, whose claims have indeed been verified, either by Court judgments or by the discoveries in the present bankruptcy case –which would make no substantial difference as, in both cases, there is a judicial validation of the grounds of the claims–, and who have asserted their rights against the Policy. Not only Capkanis' Claims do not entail any intrinsic superiority with regards the rest of the claims against the D&O, but if we were to classify claims by whether they have been proved or not, Capkanis' Claims would come in a second place.

*The unfounded "concerns" of Great American with regards to Capkanis' Claims*

53. As it is explained by the Trustee, the Capkanis Settlement Agreement is being forced by Great American as a non-negotiable condition for any general settlement. It is further explained that that is due to the fact the Great American is "concerned" about the claims that Capkanis has asserted under the Policy and want to, therefore, contain those claims in particular.

54. However, those "concerns" seem unfounded and arbitrary as: **a)** under a general buyback agreement (without a separate Capkanis Settlement), the Policy would be sold free and clear of **any** interest of **any** of the enjoined parties (including Ms. Capkanis) and Great American would be released from **any** liability; **b)** Great American would also receive an extra layer of protection against Capkanis' Claims via a Bankruptcy Court Order ratifying and giving full effect to the

settlement[27] pursuant Section 105(a); **c)** as an added protection for the settling insurer, Bankruptcy Code § 363(m) provides that a properly conducted free and clear sale cannot later be disturbed as to a good faith purchaser[28]; **d)** Capkanis' Motion for Relief from Stay was never granted; **e)** Capkanis' Claims do not have any specificity in relation to the rest of the claims.

55. In addition to that, if the Policy was released from the stay, Great American would potentially face disbursements which could easily exhaust the $ 5,000,000 limit of the Policy, so there seems to be sufficient reasons for the insurer to still want to sign a settlement for $ 3,164,500 even without a separate settlement with Capkanis.

56. In this framework, contrary to what is argued in the Trustee's Motion (§ 68), the question of whether or not Ms. Capkanis would have the right to pursue claims directly against Great American if a specific settlement of her claims is not reached <u>does</u> have significance in evaluating the Capkanis Settlement Agreement. Because if, as stated above, a general buyback agreement would seem to be enough to exhaust *per se* Ms. Capkanis' rights to pursue claims directly against Great American, then the arbitrariness of Great American's "concerns" becomes more evident and the need to remedy the imbalances of the Settlement Agreements becomes a must, whereas possible, in order to ensure a fair and equitable settlement for all creditors under the bankruptcy law.

57. The Trustee does not seem to offer specific clues as to why Great American has concerns about having to litigate that issue if the Capkanis' Claims are not specifically settled. The Trustee only states that "(b)ecause Ms. Capkanis had asserted that she has the right to assert a direct claim against Great American (...), settlement of her claims is essential" (Trustee's Motion, § 67). However, the reason why a settlement with Ms. Capkanis was "essential" from the point of view of the insurer seems to not be sufficiently explained. Especially when the insurer has already stated that only an Insured can tender a claim against the policy, even if Ms. Capkanis was free to litigate against Great American.

---

[27] Courts have long recognized that inherent within the authority to sell estate property free and clear of liens is the power to enjoin creditors from pursuing the purchaser of such property. A Court injunction barring creditors from suing the purchaser of estate assets could also be used to give to the latter an additional explicit layer of protection. *See, e.g., WBQ Partnership*, 189 B.R. at 110; *cf. MacArthur*, 837 F.2d at 93–94; *PKR Convalescent Centers*, 189 B.R. at 96…

[28] See 11 U.S.C. § 363(m). See also In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 8 (1st Cir. 1993); In re Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Vanguard Oil & Serv. Co., 88 B.R. 576, 580 (E.D.N.Y. 1988).

58. If the Capkanis Settlement Agreement is approved, but the unfair distribution that it generates is not corrected, the Capkanis Settlement Agreement will harm the paramount interests of creditors, which is to receive a fair and equitable compensation of their claims.

## III.III CORRECTING THE UNFAIRNESS AND INEQUITY OF THE SETTLEMENT AGREEMENTS

59. There seems to be two possibilities to correct the unfairness and inequity of the Settlement Agreements: **a)** by eliminating the Capkanis Settlement Agreement itself, or **b)** by establishing an *ad hoc* distribution mechanism to be that gives all creditors who have validated claims against the D&O and who, in this regard, asserted their rights under the Policy a fair and equitable chance to preferentially access the net recovery realized under the Policy in the same way that Ms. Capkanis did.

60. A brief discussion on the impacts of these two possible scenarios in terms of the protection of the best interests of the estate, reasonableness, fairness and equity and protection of creditors is provided below.

*Scenario 1: Elimination of the Capkanis Settlement Agreement*

61. This scenario ensures a distribution of the proceeds of the Policy according to the order set by the bankruptcy law (secured creditors, unsecured creditors, etc.) and adequately serves the principles of reasonableness, protection of the interest of the estates and the creditors and, above all, fairness and equity: the estate realizes a net recovery under the Policy of $ 3,164,500 (5.2% higher to the net recovery it would realize with the current Settlement Agreements) which is then distributed among the creditors according to the said order of priorities.

*Scenario 2: A fair and equitable ad hoc distribution mechanism*

62. The Trustee's Motion allows the filing of responses to the Motion and the assertion of rights under the Policy until November 15, 2022 (the "Objection Deadline"):

> "Finally, to the extent that **any party objects to the Motion on the grounds that such party has some rights under or interest in the Policy**, the Court can nonetheless approve the sale, but **whatever rights that party may have will attach to the proceeds realized under the Great American Settlement Agreement**. The interest of any party objecting to the Motion will therefore be adequately protected pursuant to Section 363(e)" (§ 81). (**emphasis** added)

In turn, Section 363(e) provides, in its relevant part, that "(...) on request of an entity that has an interest in property (...) sold (...) or proposed to be (...) sold (...) by the trustee, the court, with or without a hearing, shall prohibit or **condition such (...) sale (...) as is necessary to provide adequate protection of such interest**…". (**emphasis** added)

63. The Trustee further submits that any parties that might assert any rights under or interest in the Policy should be deemed to have waived their rights if they fail to object to the Trustee's Motion (Trustee's Motion, footer #10).

64. As previously argued, the objective conditions that ultimately gave Ms. Capkanis the chance to access the Policy in preferential terms can be reduced to the following two: a) that she had a claim against the D&O validated by a Court (default judgment), and b) that, based on that, she asserted her rights under the Policy.

65. This said and based on the terms introduced by the Trustee's Motion and Notice of Motion that set a Deadline allowing <u>all</u> creditors to fulfill a certain condition (assertion of rights under the Policy), there seems to be enough grounds to reach fairness and equity in the incorporation of the proceeds of the Policy to the estate without eliminating the Capkanis Settlement Agreement: by providing those creditors who do assert their rights under the Policy before the Objection Deadline and who have validated claims against the D&O the same protection offered to Ms. Capkanis.

66. Unlike what occurs with the situation created by the current Settlement Agreements, the preferential treatment to certain creditors will not be arbitrary since all creditors will have been given the same rights that allowed Ms. Capkanis to benefit from the Policy. The order of priority in the distribution of the proceeds realized under the Policy will have then been established on a universal, fair and equitable basis.

67. It must be noted that until the Trustee's Motion, there were no elements –suffice it to observe the Trustee's opposition to Capkanis' Claims in Trustee's Objection to Capkanis' Motion for Relief from Stay as stated above– to believe that claims against the Policy were going to be treated in a preferential way with regards and that, in addition to that and until the Trustee's Motion, no deadline had been given to assert rights against the Policy.

68. Such a mechanism would be fair and equitable regardless of the proceeds received under the Settlement Agreements for each individual creditor. Hypothetically, if all creditors end up claiming rights against the Policy before the Objection Deadline, the result in terms of what they

would receive individually will be close to zero (0)[29], far below the amount that Ms. Capkanis would have received. But even if this hypothetical result is similar to the one that the current Settlement Agreements would generate anyway (where creditors will receive an amount close to zero[30]), at least, the distribution would have been the result of the most fair and equitable arrangements that could be made under the current circumstances, having sufficiently exhausted all other possibilities. That is to say, the same result that the Settlement Agreements are proposing, but fairly and equitably generated.

69. Based also on the terms of the Trustee's Motion and Notice of Motion, those creditors who did not object to the Trustee's Motion and are, therefore, deemed to not have rights under the Policy will come in a second order of priority with regards to the distribution proceeds realized under the Policy: after having compensated creditors who did assert rights under the Policy, the remainder of the net proceeds, if any, will be distributed among those creditors according to the applicable bankruptcy law.

70. In conclusion, the establishment of a distribution mechanism that retroactively corrects the imbalances of the Settlement Agreements in terms of discriminatory treatment of similarly situated creditors will then: **a)** serve the paramount interest of the creditors by restoring global fairness and equity in the treatment of creditors; **b)** give a universal ground and justification to the deviation of the rule of priorities caused by the Settlement Agreements; **c)** preserve the same net benefit for the estate realized with the Settlement Agreements; **d)** ensure a fair distribution of that recovery.

71. All in all, from the point of view of all relevant factors for the evaluation of bankruptcy settlements, scenario 2 represents a much more optimal resolution of the incorporation of the proceeds of the Policy to the estates and, contrary to scenario 1, which would require a renegotiation with Great American that may not be possible, can be attained by Court Order.

72. A summary of the different scenarios is offered below:

---

[29] Measured in relative terms as a percentage of the amount claimed by each creditor.
[30] Measured in relative terms as a percentage of the amount claimed by each creditor.

|  | In the interest of the estate? | Net benefit for the estate | Fair and equitable? | Capkanis Settlement Payment | Compensation of creditors who are in the same conditions as Ms. Capkanis (ie. who asserted to their rights under the Policy) | Compensation of creditors who are in different conditions than Ms. Capkanis (ie. who renounced to their rights under the Policy) (*) |
|---|---|---|---|---|---|---|
| *Scenario 1.* Elimination of Capkanis Settlement Agreement | Yes | $ 3,164,500 | Yes | $ 0 | No | Close to zero (0) |
| *Scenario 2.* Ad hoc distribution mechanism | Yes (compared to litigation) | $ 3,000,000 | Yes | $ 164,000 | Yes | Close to zero (0) |
| *Scenario 3.* Settlement Agreements | Yes (compared to litigation) | $ 3,000,000 | No | $ 164,000 | No | Close to zero (0) |

*(\*) Measured in relative terms as a percentage of the amount claimed by each creditor*

## IV. CONCLUSION

**WHEREFORE**, for the forgoing reasons, being the determination of rights related to the Policy a central part of the administration of the estate which needed to be decided by the Bankruptcy Court and being the fair and equitable satisfaction of creditors the ultimate purpose of any bankruptcy case, Movant respectfully request that the unfairness and inequity of the Settlement Agreements are remedied, substantially by virtue of one of the solutions proposed in §3 or §4 above.

Failing to correct the arbitrary deviation of providing one creditor preference in the Settlement Agreements would subvert one of the fundamental policies of the Bankruptcy Code, which is that similarly situated creditors receive similar treatment, and would be to legitimize an unfair and inequitable settlement for all the creditors in general.

Dated: November 9, 2022
       Kuala Lumpur, Malaysia                    Respectfully submitted,

                                              */s/ Matías Valentín Castellano*
                                              Matías Valentín Castellano (Creditor)

Passport: 29598239C
Date of birth: 10/23/1982
B-12-3A, Kiaramas Ayuria Condominium,
9 Jalan Desa Kiara, (50480) Kuala
Lumpur, Malaysia
Cellphone: (+60) 11-12118721
Email: matias.v.castellano@gmail.com

*Pro se filer*