## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| Prodigy Network, LLC, *et al.*,[1] | Case No. 21-10622 (JTD) |
| Debtors. | **Objection Deadline: March 1, 2023 at 4:00 p.m. (ET)**<br>**Hearing Date: March 21, 2023 at 11:00 a.m. (ET)** |

## TRUSTEE'S MOTION FOR ORDER: (I) APPROVING SETTLEMENT AGREEMENT PURSUANT RULE 9019; (II) APPROVING SALE OF INSURANCE POLICY TO CARRIER; AND (III) GRANTING RELATED RELIEF

Jeoffrey L. Burtch, the duly appointed Chapter 7 Trustee (the "Trustee") for the estates of the above-captioned debtors (the "Debtors"), by and through his counsel, hereby files this motion for entry of an order: (I) approving the Settlement Agreement (as further defined below, the "Settlement Agreement") with Hartford Accident and Indemnity Company ("Hartford") pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (II) approving the sale of an insurance policy to Hartford; and (III) granting related relief (the "Motion"), and in support thereof, states as follows:

## JURISDICTION, VENUE, PREDICATES FOR RELIEF

1.  The United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these cases are the following entities (the respective case numbers for each case follows in parentheses): 1234 W. Randolph Realty Associates LLC (21-10612-JTD), Prodigy Shorewood Master Rep Fund LLC-1234 W Randolph Series (21-10613-JTD), 1234 W Randolph Newco, Inc. (21-10614-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC-1234 W Randolph Series (21-10615-JTD), 1400 N Orleans Realty Associates LLC (21-10616-JTD), Prodigy Shorewood Master Rep Fund LLC-1400 N. Orleans Series (21-10617-JTD), Prodigy Shorewood Domestic Feeder Rep Fund LLC- 1400 N Orleans Series (21-10618-JTD), 1400 N Orleans Newco, Inc. (21-10619-JTD), Prodigy Network Miami, LLC (21-10620-JTD), The Assemblage Hospitality, LLC (21-10621-JTD), and Prodigy Network, LLC (21-10622-JTD).

LEGAL\61587372\1

3. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 105 and 363[2] and Bankruptcy Rules 6004 and 9019.

4. Pursuant to Local Rule 9013-l(f), the Trustee consents to the entry of a final order with respect to this Motion if it is determined that the Court lacks adjudicatory authority under Article III of the United States Constitution to enter such final order absent consent of the parties.

## PRELIMINARY STATEMENT[3]

5. By this Motion, the Trustee is seeking Court approval of the settlement of certain claims, achieved through mediation and continued negotiation, under which the Debtors' estates will receive a settlement payment in the amount of $87,500.00 from Hartford under that certain Premier Excess Policy No. 10 DB 0324592-18 (the "Hartford Policy"). This settlement has been reached as a supplement to the settlement reached with Great American Insurance Company ("Great American") that is the subject of a separate Rule 9019 motion filed at D.I. 190 (the "Great American Approval Motion").

6. This settlement, in conjunction with the Great American settlement as set forth in the Great American Approval Motion, which together will enable the estates to realize $3,087,500.00 (and satisfy a claim asserted by a former employee), resolves certain of the estates' claims against the Debtors' former officers and directors that the Trustee asserts would be covered under an insurance policy covering certain claims against the Debtors' directors, officers, general partners, managers, and equivalent executives or employees (collectively, the "Directors and Officers"). This settlement with Hartford is subject to and conditioned upon approval of the settlement with Great American. As set forth further below, the Trustee expressly does not release

---

[2] Unless otherwise indicated, all statutory citations are to the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code")).

[3] While Hartford supports approval of the settlement, the statements and contentions in this Motion are solely those of the Trustee.

any claims against Directors and Officers of Prodigy arising under Sections 544, 547, 548, and/or 550 of the Bankruptcy Code, or state law made applicable under any such statute.

7.     Absent a settlement of these certain claims, the Trustee would have to engage in costly and time-consuming litigation of those certain claims against the Directors and Officers (the "<u>D&O Claims</u>"), while also potentially having to litigate complicated insurance coverage issues against Hartford.

8.     The Hartford Policy provides coverage for certain claims against, among others, the Directors and Officers and the Debtors, for liability arising out of certain specified acts or omissions, as well as costs of defense. Coverage for all losses (including costs of defense) under the Hartford Policy is limited to $5 million.

9.     The Hartford Policy is excess to, and follows form to, an insurance policy issued by Great American Insurance Company ("<u>Great American</u>"), that is, the Private Equity Liability Insurance Policy No. PEP2788734 (the "<u>GA Policy</u>"), except as otherwise stated in the Hartford Policy.

10.     The costs of litigating the D&O Claims would be substantial, and would therefore ultimately reduce the net recovery that the estates might realize under the Hartford Policy absent consensual resolution.

11.     In the absence of consensual resolution, the Trustee would likely face extensive litigation against Hartford over coverage issues, including complicated legal issues involving exhaustion of the GA Policy and the triggering of the Hartford Policy.  It is uncertain whether coverage would be available under the Hartford Policy in the event of the settlement and policy buy-back of the GA Policy, as is contemplated by the pending Rule 9019 motion for approval of a settlement between Great American and the Trustee (*see* DE 190).

## BACKGROUND

12.     On March 25, 2021, the Debtors filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code.

13.     On or about March 26, 2021, the Trustee was appointed as interim trustee pursuant to Section 701 of the Bankruptcy Code.

14.     The meeting of creditors held pursuant to Section 341 of the Bankruptcy Code was started on April 29, 2021 and was concluded on May 19, 2021. The Trustee is now serving pursuant to Section 702(d) of the Bankruptcy Code.

## A. D&O Claims

15.     Because the Hartford Policy is excess to, and follows, the GA Policy, this section largely repeats the analogous section from the Great American Approval Motion (DE 190).  As noted above, this settlement has been reached in addition to, and in conjunction with, the Great American settlement of $3,000,000 to be paid to the Prodigy Network estate.

16.     The Debtors were part of a large corporate structure (the "Prodigy Enterprise") that was involved in various real estate development projects and related ventures. To finance many of these projects, the Debtors raised capital through a crowdfunding platform, soliciting investments from individuals in the United States and abroad.

17.     Substantially all of the Debtors' operations and projects were primarily controlled by Rodrigo Niño until his death in May 2020. Upon information and belief, other individuals who participated in management included:[4]

---

[4] Debtor Prodigy Network, LLC ("Prodigy Network") often served as manager of the entities within the Prodigy Enterprise, either formally or *de facto*, and the leadership team of Prodigy Network served also as the leadership team of the Prodigy Enterprise.  Unless otherwise indicated, references to the titles of the Directors and Officers are to their roles with Prodigy Network.

a.    Brian Newman, Vice President of Business development from March 2012 until April 2019, and who worked on strategic planning and efforts to expand business into new markets;

b.    Carey Fieldcamp, Chief Financial Officer from approximately January 2019 until mid-2020;

c.    Vincent Mikolay, Chief Operating Officer from late 2017 until late 2018;

d.    Leonard Chinchay, Vice President of Client Relations from the founding of the enterprise in approximately 2013 until June 2019;

e.    Bill Garcia, Chief Operations Officer from approximately 2015 until 2017;

f.    Alejandra Rincon, Vice President of Operations from December 2017 to February 2019, Business Development Director from June 2016 until December 2017, and Marking Director from June 2015 to June 2016; and

g.    Juanita Galvis, the separated spouse of Mr. Niño, who assumed control of Prodigy Network LLC and several other wholly-owned entities after Mr. Niño's death.

18.    The Prodigy Enterprise engaged in investment crowdfunding and real estate development, along with property management through The Assemblage brand, from approximately 2013 through 2020. The crowdfunded portfolio included six projects in New York, and two in Chicago.

19.    Shorewood Real Estate Group ("Shorewood"), which is owned and controlled by S. Lawrence Davis, collaborated closely with many Prodigy entities, the Directors and Officers, and Prodigy Network on Prodigy's New York real estate projects.[5]

20.    In addition to soliciting investments in the various entities that were involved in particular projects, Prodigy Network undertook an offering of corporate securities in Prodigy Network itself in 2018 and 2019.

---

[5] Mr. Davis and Mr. Niño each controlled 50% of a shared entity named Prodigy Shorewood Investment Management LLC ("PSIM"), which served as investment manager for many Prodigy Enterprise projects.  PSIM is among the insureds under the GA Policy and the Hartford Policy.  Prodigy had numerous joint ventures with Shorewood.

21.     By early 2019, the Prodigy Enterprise was showing signs of serious financial distress.  In or around June 2019, Mr. Niño purported to resign as CEO.  However, no replacement CEO was ever named, and Mr. Niño continued to exercise substantially complete control over the Prodigy Enterprise.

22.     Neither Prodigy Network nor any other part of the Prodigy Enterprise ever had a board of directors, and Mr. Niño effectively performed all functions that would typically be the responsibility of a board.

23.     In or around June 2019, the Prodigy Enterprise laid off the majority of its workforce, and engaged consultants and counsel to assist with restructuring efforts. Around this same time, Prodigy Network engaged in restructuring discussions with at least one potential buyer. However, in or around January 2020, the primary restructuring consultant resigned from that role, apparently on the grounds that no one within the Prodigy Enterprise was providing the information necessary for the project.

24.     In May 2020, Mr. Niño passed away after a protracted battle with cancer.  Mr. Niño had recovered from an earlier bout of cancer several years earlier.  No replacement CEO or other lead executive was named, and the Prodigy Enterprise effectively had no leadership from the time of Mr. Niño's death through the Petition Date.

25.     In 2019 and 2020, numerous investors filed civil lawsuits against a number of Prodigy Network affiliates. No defense was offered in the majority of these suits, leading to a number of defaults.

26.     Throughout the above-described history, it appears that there are grounds to allege that the Directors and Officers engaged in a number of wrongful acts and omissions including, but not limited to, the following:

a.  Gross mismanagement, which led to the collapse of substantially the entire Prodigy Enterprise by mid-2019 to early 2020. This mismanagement stemmed, at least in part, from a failure of corporate governance. The Directors and Officers permitted control to be unreasonably concentrated in Mr. Niño, with no sort of reasonable oversight or consultation.

b.  Mr. Niño unreasonably confined management within Prodigy Network, which resulted in a lack of shared knowledge regarding financial and management problems faced by different parts of the Prodigy Enterprise. Executives and employees were given information only as deemed necessary to complete their jobs, but not sufficient to understand the workings of the Prodigy Enterprise as a whole.

c.  Mr. Niño and others permitted serious cost overruns on numerous development projects, and also authorized several ill-conceived pet projects by Mr. Niño, including the acquisition a property in upstate New York to develop into a retreat. To make matters worse, the property was purchased from Mr. Niño at a questionable valuation.

d.  Prior to Mr. Niño's death, the Directors and Officers breached their duties by failing to create a succession plan. Mr. Niño had suffered from cancer a number of years earlier, and knew there was a significant chance of recurrence. By 2019, if not sooner, Mr. Niño was again receiving treatment for cancer. Despite this, neither Mr. Niño nor any of the other Directors and Officers enacted a succession plan in preparation for Mr. Niño's death or disability.

e.  After Mr. Niño's death, the Directors and Officers breached their fiduciary duties by failing to take reasonable steps to preserve assets, despite Prodigy's apparent insolvency. In addition to failing to adopt any reasonable restructuring plans, they permitted Shorewood to seize control or otherwise dispose of numerous assets that may have had value to the Prodigy Enterprise.

27.  While there may be defenses, the Trustee has reason to believe that some or all of failures of the Directors and Officers described above may constitute wrongful acts giving rise to coverage under the Hartford Policy. On or about September 10, 2021, therefore, the Trustee, through special litigation counsel, gave Great American notice of circumstances that there may be grounds to assert claims under the GA Policy. Subsequently, upon identification of the Hartford Policy, the Trustee, through special litigation counsel, gave Hartford notice of circumstances that there may be grounds to assert claims under the Hartford Policy. Great American, Hartford, and

the Trustee thereafter began discussions in an effort to reach a consensual settlement of the estates' claims that the Trustee asserted would be covered under the GA Policy and/or the Hartford Policy.

## C. Mediation and Summary of Settlement Agreement[6]

28.     After extensive communications regarding potential claims and defenses, the parties and others – the Trustee, Hartford, Great American, and Emily Capkanis – agreed to participate in mediation. The mediation was held on May 24, 2022.

29.     No resolution was reached at the conclusion of the mediation, but settlement negotiations continued, and by late July 2022, the Trustee, Great American, and Ms. Capkanis had reached agreement on the material terms of a comprehensive resolution of claims by and among the Trustee, Great American, and Ms. Capkanis.

30.     On or about October 17, 2022, the Trustee filed the Great American Approval Motion.

31.     Thereafter, the Trustee and Hartford re-engaged in settlement negotiations aimed at resolving claims involving the Hartford Policy.

32.     As relevant herein, the Trustee and Hartford eventually reduced the terms of their agreements to those set forth in the Settlement Agreement. A true and correct copy of the Settlement Agreement is attached hereto as Exhibit A.

33.     Pursuant to the Settlement Agreement, Hartford will pay the sum of $87,500.00 (the "Hartford Settlement Amount").  In exchange for payment of the Hartford Settlement Amount, Hartford shall be released from:

---

[6] This Motion contains a summary of certain terms of the Settlement Agreement, and does not set out all of its terms. To the extent of any inconsistency between the summary set forth in this Motion and the Settlement Agreement, the Settlement Agreement shall govern.  Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings provided in the Settlement Agreement.

     a.      any and all Claims by any Person, including any Insured, for insurance coverage, payment, or other obligations, rights or recoveries of any kind under the Hartford Policy;

     b.      any and all Released Claims, including without limitation any obligations or duties of any kind arising from, or that could have arisen from, such Released Claims; and

     c.      any and all Claims, whether known or unknown, suspected, claimed or alleged, fixed or contingent, arising from, related to, or in connection with the making, drafting, negotiation, or execution of the Agreement.

Exhibit A, Settlement Agreement, § V(1).

34.     The Settlement Agreement further provides that:

Effective immediately upon the receipt of the Settlement Payment by the Trustee and without any further action being required, the Hartford Policy, and any and all of the Insureds' rights and interests in the Hartford Policy, shall be deemed to have been sold back to Hartford pursuant to sections 363(b) and (f) of the Bankruptcy Code free and clear of any interest or right in the Hartford Policy, with such interests or rights attaching to the Settlement Payment in accordance with their respective priorities. The Hartford Policy shall be deemed terminated for all purposes, all rights, duties, and coverage under the Hartford Policy shall be fully and finally extinguished, and the Hartford Policy shall no longer remain in effect. Furthermore, the Approval Order shall provide that (i) all Persons who hold or assert, or may in the future hold or assert, any claim against an Insured, arising in connection with any activities covered by the Hartford Policy, or in connection with the Insureds' activities giving rise to the claims made or to be made under the Hartford Policy, or (ii) any other Person who may claim to be an insured, additional insured, or otherwise entitled to any benefit or recovery, directly or indirectly, from or under the Hartford Policy, are permanently stayed, restrained, and enjoined from asserting any such claim, right or entitlement, commencing a proceeding, or taking any other action against Hartford for the purpose of obtaining any recovery or other relief from Hartford or under or in connection with the Hartford Policy.

*Id.*, § V(2).

35.     The Settlement Agreement is conditioned on, among other things, approval of the settlement agreement between the Trustee and Great American as set forth in the Great American Approval Motion, which is further contingent upon the approval of a settlement agreement with Ms. Capkanis. *Id.*, § II.

36.     With respect to the Hartford Policy and the GA Policy, while the Trustee believes the D&O Claims may have merit and that damages may exceed the total amount of coverage remaining under the Hartford Policy and the GA Policy, there is no question that litigation of those claims would be difficult and costly, and there can be no certainty that the Trustee would prevail.

37.     In general, claims of the sort at issue are typically very fact intensive and complex, and therefore expensive to prepare and litigate. In the present case, it is reasonable to believe that litigation would be particularly difficult. Among other things, the most significant D&O Claims involve Rodrigo Niño's conduct as the party primarily responsible for overall management of the Prodigy Enterprise. Because Mr. Niño is deceased, collection and presentation of evidence would be more complicated than in a typical case.

38.     Furthermore, in evaluating any proposed settlement, it is critical to bear in mind that the Hartford Policy is a "wasting" policy, meaning that it covers costs of defense, and those costs reduce available coverage. If the Trustee were required to pursue the D&O Claims in litigation, a significant number of the Directors and Officers would be sued.  It is very likely that conflicts or potential conflicts would exist among the defendants, requiring the engagement of multiple different defense counsel and rapidly eroding limits under the GA Policy and likely reaching the Hartford Policy as well in providing coverage for costs of defense.  Accordingly, if the Trustee were to ultimately prevail in litigation, the estates would not only bear the costs of prosecuting the action(s), their potential recovery would be reduced by all costs of defense, which would undoubtedly be considerable.

39.     Another significant factor to consider is the fees that will be payable to the Trustee's counsel out of any recovery. The Trustee has engaged special litigation counsel, which is entitled to reimbursement of costs and expenses and a contingent fee equal to: (a) twenty-five percent

(25%) of any recovery realized prior to the commencement of litigation; or (b) thirty-five percent (35%) of any recovery realized after the commencement of litigation. *See* Application to Retain and Employ DGW Kramer LLP as Special Litigation Counsel [D.I. 21], and Order Authorizing Jeoffrey L. Burtch, Chapter 7 Trustee, to Retain and Employ DGW Kramer LLP as Special Litigation Counsel to the Trustee Pursuant to 11 U.S.C. §§ 327, 328, 330, and 331 and Fed. R. Bankr. P. 2014 [D.I. 27]. By resolving the D&O Claims before the initiation of litigation, the Trustee will not only avoid the substantial costs and expenses associated with litigation of this type, he will also reduce professional fees by ten percent (10%).

40.     With all of the foregoing issues and considerations in mind, the Trustee now seeks Bankruptcy Court approval for the Settlement Agreement.

**RELIEF REQUESTED**

41.     By and through this Motion, the Trustee seeks entry of an order, substantially in the form of the proposed order attached hereto: (a) approving the Settlement Agreement; (b) approving the sale of the Hartford Policy to Hartford as provided in the Settlement Agreement; and (c) granting related relief.

42.     In connection with the relief sought herein, the Trustee further seeks approval of his determination that the entirety of the net proceeds realized through the Settlement Agreement should be allocated to the Prodigy Network estate.

**A. Approval of the Settlement Agreement**

43.     Bankruptcy Rule 9019 governs the approval of compromises and settlements, and provides as follows:

> On motion by the Trustee and after notice and a hearing, the court may approve a compromise or settlement. Notice shall be given to creditors, the United States trustee, the debtor, and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019.

44.     The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also Matter of Penn Central Transp. Co.*, 596 F.2d 1102, 1113 (3d Cir. 1979) ("In administrating reorganization proceedings in an economical and practical matter it will often be wise to arrange the settlement of claims . . . .") (internal citation marks and quotation marks omitted).

45.     In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] [it]self of all facts necessary [to form] an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated, [and] estimate . . . the complexity, expense and likely duration of such litigation . . . all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Matter of Penn Central Transp. Co.*, 596 F.2d at 1114; *see also In re Marvel Entm't Group, Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (describing the "ultimate inquiry to be whether the compromise is fair, reasonable, and in interest of the estate") (internal citations and quotation marks omitted).

46.     The United States Court of Appeals for the Third Circuit has enumerated four factors that should be considered in determining whether a compromise should be approved: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (*citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424-25 (1968)); *accord In re Nutraquest, Inc.,* 434 F.3d 639, 644 (3d Cir. 2006).

47. In making its decisions, the bankruptcy court should not substitute its judgment for that of the trustee. The court is not to decide the numerous questions of law or fact raised by the litigation, but rather should evaluate the issues to determine "whether the settlement fall[s] below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983), *cert. denied*, 464 U.S. 22 (1983) (internal citations and quotations omitted); *see also In re World Health Alternatives, Inc.*, 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the range of litigation possibilities") (internal quotation marks and citations omitted).

48. In passing upon the reasonableness of a proposed compromise, the Court "may give weight to the opinions of the Trustee, the parties and their counsel in determining the reasonableness of the proposed settlement." *In re Bell & Beckwith*, 77 B.R. 606, 612 (Bankr. N.D. Ohio), *aff'd*, 87 B.R. 412 (N.D. Ohio 1987); *accord In re Ashford Hotels Ltd.*, 226 B.R. 797, 802 (Bankr. S.D.N.Y. 1998) ("Significantly, that test does not contemplate that I substitute my judgment for the Trustee's, but only that I test his choice for reasonableness . . . . If the Trustee chooses one of two reasonable choices, I must approve that choice, even if, all things being equal, I would have selected the other") (internal citations omitted).

49. The Trustee believes that the Settlement Agreement rises well above the "lowest point in the range of reasonableness." Additionally, as discussed more fully below, each of the applicable *Martin* factors weighs heavily in favor of the Settlement Agreement. The Court should

therefore approve the Settlement Agreement pursuant to Bankruptcy Rule 9019 and applicable law.

### i. Settlement Agreement

**Consideration of the probability of success in litigating the D&O Claims weighs in favor of approval of the Settlement Agreement.**

50.     While the Trustee believes that there is more than a plausible possibility of success on at least a portion of the D&O Claims if litigation were to be commenced, the outcome of such litigation can never be certain. The claims resolved by the Settlement Agreement – and by the Great American settlement, in conjunction – involve difficult questions of state law regarding directors' and officers' duty of care, and whether and to what extent the Debtors were harmed by the actions or inaction of the Directors and Officers.

51.     Particularly given the death of Mr. Niño, who had far more knowledge regarding management of the Prodigy Enterprise than any other person, there might be serious evidentiary obstacles to carrying the burden of proof necessary to prevail on the D&O Claims. The risks inherent in litigation of the D&O Claims more than justify the discount that the Trustee is taking on what theoretically might be collected under the Hartford Policy.

52.     Moreover, if the Court were to approve the Great American Settlement without addressing the Hartford Policy, the Trustee would face challenging legal issues involving the exhaustion of the GA Policy and the availability of coverage under the Hartford Policy. Hartford has stated its intention to litigate this issue aggressively, and the existing case law is limited and unclear. It is uncertain whether coverage would be available under the Hartford Policy if the Court granted the Great American Approval Motion as filed and if the GA Policy were deemed exhausted by court order. By resolving issues involving both the GA Policy and the Hartford Policy now, the Trustee is able to ensure a recovery for creditors from the Hartford Policy as well.

**Absent settlement, there would likely be significant difficulties in collection on account of the D&O Claims.**

53.     In the absence of recovery from available insurance, it is likely that the Trustee would experience significant difficulties enforcing any judgments that might be entered on account of the D&O Claims. The Directors and Officers are, obviously, all individuals, and there are nearly invariably complications in collecting from natural persons. Some of the Directors and Officers may have financial means, but there can be no certainty that their financial situations would not deteriorate over the years of litigation that would be necessary before judgments were entered.

54.     Another significant impediment to collection from the Directors and Officers personally lays in the fact that Mr. Niño, who had the most responsibility for any mismanagement that occurred, is deceased. Upon information and belief, there is no probate proceeding, and there is no readily apparent means of collecting on any claim against Mr. Niño apart from under the GA Policy and the Hartford Policy.

55.     In this case, the only certain source of recovery for the D&O Claims is the insurance coverage maintained by the Debtors, and the best way of maximizing recovery is to settle claims under the GA Policy and the Hartford Policy before policy limits are further eroded by reason of defense costs. Approval of the Settlement Agreement – contingent upon approval of the Great American Settlement Agreement – is the best way to achieve that.

**Consideration of the complexity of litigation involved, and expense, inconvenience, and delay necessarily attending such litigation weighs heavily in favor of approval of the Settlement Agreement.**

56.     Litigation involving claims based on breach of duty by directors and officers is invariably complicated and time-consuming. The D&O Claims would all involve complex legal and factual issues, potentially necessitating years of litigation and appeals. Among other things, litigation would be expensive for the estates and would significantly erode the Hartford Policy

through the accrual and payment of defense costs for multiple defendants. The proposed settlement avoids these problems in favor of a prompt and efficient resolution without the need to expend further resources, much to the benefit of the estates.

57.     Moreover, as noted above, the Trustee would also likely need to litigate issues of insurance exhaustion before being able to access the Hartford Policy, in the absence of settlement.

**Approval of the Settlement Agreement will serve the paramount interest of creditors.**

58.     The Settlement Agreement serves the paramount interest of creditors.  Resolution of the claims under the Hartford Policy on the proposed terms represents a successful outcome for creditors by obviating the need for potentially protracted litigation, and the fees and expenses necessarily attendant to such litigation. The fourth *Martin* factor is therefore satisfied and weighs heavily in favor of approval of the Settlement Agreement.

59.     Based on the foregoing, the Trustee submits that approval of the Settlement Agreement is in the best interests of the estates and creditors because it eliminates the risk that there would be no recovery from the Hartford Policy on account of the D&O Claims, and reduces the possibility of any protracted litigation with the settling party. Approval of the Settlement Agreement will also ease the administrative burden on the estates and provide for a certain, meaningful recovery in the amount of $87,500.00 from Hartford, along with $3 million under the separate Great American Settlement Agreement, assuming both are approved by the Court.

**B. Approval of the Sale of the Policy to Hartford**

60.     Because the Settlement Agreement provides for an insurance policy buyback, or the sale by the Debtors of the Hartford Policy free and clear of liens and other interests, the Trustee must also establish grounds for relief under Section 363(b) and (f) of the Bankruptcy Code.

61.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the

estate."[7] Courts have held that proposed sales of property pursuant to section 363(b) should be approved upon a finding that the decision to enter into the transaction represents a reasonable business judgment. *See, e.g., In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 176 (Bankr. D. Del. 1991) (holding that a court must be satisfied that there is a "sound business reason" justifying sale of assets); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

62.     The Trustee believes that the decision to sell the Hartford Policy back to Hartford is a prudent and proper exercise of the Trustee's business judgment and is supported by sound business reasons.

63.     For reasons described above, after weighing all of the relevant factors, the Trustee has reasonably determined that approval of the Settlement Agreement is in the best interests of the estates, and it is an essential term of the Settlement Agreement that Hartford be released from all further liability on account of the Hartford Policy. The sale of the Hartford Policy is merely one means of effecting the release, and the Hartford Settlement Payment represents a reasonable determination of the value of the Hartford Policy to the estates.

64.     Because approval of the Settlement Agreement is appropriate, the sale of the Hartford Policy is necessarily also appropriate. Indeed, from the perspective of a trustee or a bankruptcy estate, in most cases there is no material difference between settlement of a claim and a sale of the claim. *See In re Telesphere Communications, Inc.*, 179 B.R. 544, 552 n. 7

---

[7] There is no reasonable dispute that the Hartford Policy is property of the bankruptcy estate. *See, e.g., Acands, Inc. v. Travelers Cas. and Sur. Co.*, 435 F.3d 252, 260 (3d Cir.2006) ("It has long been the rule in this Circuit that insurance policies are considered part of the property of a bankruptcy estate").

(Bankr.N.D.Ill.1994) ("The settlement of a cause of action held by the estate is plainly the equivalent of a sale of that claim. There is no difference in the effect on the estate between the sale of a claim (by way of assignment) to a third party and a settlement of the claim with an adverse party.").[8]

65.     The Settlement Agreement further provides that the sale of the Hartford Policy must be free and clear of any interest or right in the Hartford Policy, with such interests and rights, if any, attaching to the proceeds of the sale. The Trustee therefore requests that the sale be free and clear of all liens, claims, rights, and encumbrances.

66.     Section 363(f) of the Bankruptcy Code provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if -

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in a bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

67.     Section 363(f) is drafted in the disjunctive. Thus, satisfaction of any one of the elements would permit sale of the Property free and clear of all liens, claims, rights, and encumbrances, *See, e.g., Citicorp Homeowners Servs., Inc. v. Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988).

---

[8] Pursuant to Local Rule 6004-1(b)(iv), the Trustee makes the following disclosures: (a) Hartford will be released from all claims arising out of or related to the Hartford Policy (6004-1(b)(iv)(C)); and (b) No auction will be held, and the Trustee is not seeking competing bids for the Hartford Policy (6004-1(b)(iv)(D)).

68.     The Hartford Policy may be sold free and clear of all interests pursuant to Section 363(f)(2), (f)(4), and (f)(5). Section 363(f) authorizes a sale free and clear of "interests," not merely liens, and thus permits a sale of property free and clear of all claims and interests of any entity that "are derivative of the debtors' rights in that property." *See In re Dow Corning Corp.*, 198 B.R. at 244; *In re Johns-Manville Corp.*, 837 F.2d at 94 (claims of coinsured party and direct action of asbestos claimants could be channeled to the proceeds of insurance settlement).

69.     The Trustee has taken steps to give notice of this Motion to parties who might reasonably be expected to have an interest in the Hartford Policy. To the extent that any parties who receive notice of the Settlement Agreement fail to object, such parties should be deemed to have consented to the sale pursuant to 11 U.S.C. § 363(f)(2). *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (for purposes of Section 363(f), creditor "consented to the sale by failing to make any timely objection after receiving notice of the sale."); *In re Junk*, 566 B.R. 897, 916 (Bankr. S.D. Ohio 2017) ("Failure to object by any party that received notice of the Motion constitutes consent within the meaning of § 363(f)(2) to the sale free and clear.") (citing *FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285–86 (7th Cir. 2002)).

70.     To the extent any objections are filed, the Hartford Policy may still be sold free and clear of all interests pursuant to Section 363(f)(5).[9] Under Section 363(f)(5), property of the estate can be sold free and clear of an interest of any entity if "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." There is no question that, to the extent that any party might assert a right to coverage or recovery under the Hartford Policy, such party could be compelled to accept a money satisfaction on account of such interest. Indeed,

---

[9] The Trustee further submits that any parties that might assert any rights under or interest in the Hartford Policy should be deemed to have waived their rights if they fail to object to this Motion. *Folger Adam Security, Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 265 (3d Cir. 2000).

payment of money is the entire purpose of insurance of the type at issue here – the insurer's obligations are essentially limited to the payment of money. Accordingly, the Hartford Policy can be sold as contemplated in the Settlement Agreement pursuant to Section 363(f)(5).

71.     Finally, to the extent that any party objects to the Motion on the grounds that such party has some rights under or interest in the Hartford Policy, the Court can nonetheless approve the sale, but whatever rights that party may have will attach to the proceeds realized under the Settlement Agreement. The interest of any party objecting to the Motion will therefore be adequately protected pursuant to Section 363(e).[10]

### C. Supplemental Injunction

72.     Under the Settlement Agreement, the Trustee is required to seek entry of an approval order that provides, in relevant part, that

> (i) all Persons who hold or assert, or may in the future hold or assert, any claim against an Insured, arising in connection with any activities covered by the Hartford Policy, or in connection with the Insureds' activities giving rise to the claims made or to be made under the Hartford Policy, or (ii) any other Person who may claim to be an insured, additional insured, or otherwise entitled to any benefit or recovery, directly or indirectly, from or under the Policy, are permanently stayed, restrained, and enjoined from asserting any such claim, right or entitlement, commencing a proceeding, or taking any other action against Hartford for the purpose of obtaining any recovery or other relief from Hartford or under or in connection with the Hartford Policy.

Exhibit A, Settlement Agreement, § V(2).

73.     In the context of a settlement with an insurance carrier that includes a policy buy-back, an injunction of the type described above is appropriate. As a practical matter, the proposed injunction does little more than clarify the effect of the releases that are provided for as part of the

---

[10] Section 363(e) provides, in relevant part, that "[n]otwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest…"

settlement of claims, and further ensure that Hartford will take title to the Hartford Policy free and clear of *any* interest of any of the enjoined parties. The injunction, therefore, is "necessary or appropriate to carry out the provisions of" Section 363(f), and within the scope of the Court's authority under Section 105(a):

> Courts have long recognized that inherent within the authority to sell estate property free and clear of liens is the power to enjoin creditors from pursuing the purchaser of such property. *See Whitehead & Kales Co. v. Dempster (In re Wiltse Bros. Corp.),* 361 F.2d 295, 299 (6th Cir.1966). Nevertheless, more explicit protection is often needed to effectuate this important aspect of a § 363 sale. In other words, an actual injunction barring creditors from suing a purchaser of estate assets is sometimes necessary and appropriate to give the "free and clear" aspect of § 363(f) meaning. When this is the case, a court has the power to "issue an [ ] order ... necessary or appropriate to carry out [§ 363(f), one of] the provisions of the [Bankruptcy Code]." 11 U.S.C. § 105(a). *See, e.g., WBQ Partnership,* 189 B.R. at 110; *cf. MacArthur,* 837 F.2d at 93–94; *PKR Convalescent Centers,* 189 B.R. at 96…

*In re Dow Corning Corp.*, 198 B.R. 214, 245 (Bankr. E.D. Mich. 1996).

74.     To give full effect to the Settlement Agreement, and the sale free and clear as provided therein, the Court should exercise its equitable power under Section 105(a) to enjoin parties that might otherwise assert some right under, or interest in, the Hartford Policy from asserting or seeking to enforce such right or interest against Hartford or the Hartford Policy.[11]

### D. Approval of the Proposed Allocation of Settlement Proceeds

75.     The Trustee requests that the Court approve the Trustee's determination that the entirety of the net proceeds of the Settlement Agreement should be allocated to, and be deemed the sole property of, the estate of Debtor Prodigy Network, LLC (Case No. 21-10622).

---

[11] As noted above, such parties' rights and interests, if any, will attach to the proceeds of the sale of the Hartford Policy and may be asserted in the Bankruptcy Cases subject to all relevant provisions of the Bankruptcy Code, Bankruptcy Rules and applicable non-bankruptcy law.

76.     The allocation determination is appropriate in the circumstances of these cases for a number of reasons, including, but not limited to, the following:

a.      Given the lack of clearly identified directors, officers, or other agents of substantially all other entities making up the Prodigy Enterprise, it appears that the conduct giving rise to the D&O Claims took place primarily at the Prodigy Network level;

b.      While other entities may have suffered compensable damages, it appears that investors in many projects (and therefore holders of interests in many different entities) have filed proofs of claim in the Prodigy Network case;

c.      A precise, objective allocation of damages among the entities that might have covered claims against the Directors and Officers may not be possible, and would be exceedingly complicated and costly; and

d.      Virtually all creditors that have filed claims in any of the Debtors' cases, filed claims in the Prodigy Network case.[12]

77.     In cases involving numerous affiliated debtors, the appropriate allocation of damages that might have been suffered by reason of the actions or inactions of management can be a very difficult problem.

78.     In the present case, the most reasonable and equitable way of addressing this problem is by concentrating all of the settlement proceeds in the estate of the Debtor that was apparently at the center of substantially all management decisions. Not only is this the estate that most certainly suffered the greatest damage, it is also the estate against which virtually all claims have been filed.

79.     By allocating all of the net proceeds from the Settlement Agreements to the Prodigy Network estate, the Trustee will most be able to administer the assets in a way that is both most efficient and most equitable

---

[12] 1,826 claims have been filed in the Prodigy Network case. The number of claims filed in the other cases ranges from 65 to 134. Out of the claims that were filed against Debtors other than Prodigy Network, only nine were not also filed in the Prodigy Network case.

### E. Releases to Directors and Officers

80.     As a term of the Hartford Settlement Agreement, the Trustee agrees to a release of certain claims against the directors and officers of Prodigy arising from their actions or omissions in their capacity as directors and officers of Prodigy.  *See* Exhibit A, § V.4.

81.     The Trustee expressly does not release any claims against Directors and Officers of Prodigy arising under Sections 544, 547, 548, and/or 550 of the Bankruptcy Code, or state law made applicable under any such statute.  The Trustee expressly does not release claims for avoidance of fraudulent transfer, including but not limited to claims against Directors and Officers of Prodigy – including but not limited to Brian Newman, Leonard Chinchay, and Vincent Mikolay – arising from their receipt of "Participation Incentive Unit" redemption transfers in 2018 and 2019, and including but not limited to claims against Juanita Galvis arising from her receipt of certain life insurance benefits in or about June 2020.

82.     Further, the Trustee expressly does not release any claims against S. Lawrence Davis ("Davis"), Shorewood, David Simon, Stephen Im, or other employees, officers, or directors of Shorewood (together, the "Davis Parties"), to the extent that the Davis Parties were acting as officers or directors of entities other than the Debtors.

83.     In resolution of an informal objection from Davis and Shorewood, as set forth in specific terms in the attached Proposed Order, upon approval of the attached Proposed Order, the Trustee will limit the potential out-of-pocket exposure for the Davis Parties for any non-released claims to the amounts that may be recovered from any policy of insurance other than the Hartford Policy or the GA Policy, except as to claims arising under Sections 544, 547, 548, and/or 550 of the Bankruptcy Code, or state law made applicable under any such statute.[13]

---

[13] The terms applying to the limitation of out-of-pocket exposure on Trustee's claims against the Davis Parties are included in the Proposed Order to this motion and are not duplicated in the proposed order for the Great American

## **NOTICE**

84.     The Trustee has provided notice of this Motion to:

    a.     The United States Trustee;

    b.     Counsel for Great American;

    c.     Counsel for Hartford;

    d.     Counsel for Ms. Capkanis;

    e.     The Directors and Officers;

    f.     Shorewood Real Estate Group and S. Lawrence Davis; and

    g.     All parties who have appeared in these Bankruptcy Cases or requested notice pursuant to Bankruptcy Rule 2002.

85.     Under the circumstances of these cases and the relief sought herein, the Trustee submits that such service is sufficient.

---

Approval Motion.  The inclusion of this language in only the Proposed Order for the instant motion and not the Great American Approval Motion shall not be construed as limiting the effectiveness of that provision in any way.

## CONCLUSION

WHEREFORE, the Trustee respectfully requests that, so long as the Court simultaneously grants the Great American Approval Motion and approves the Great American Settlement, this Court enter the attached Proposed Form of Order granting the Motion, approving the Settlement Agreement on the terms proposed herein and granting such other and further relief as may be just and equitable.

Dated: February 15, 2023            DGW KRAMER LLP

*/s/ Katherine Burghardt Kramer*
Katherine Burghardt Kramer, Esq. (*Pro Hac Vice*)
Rongping Wu, Esq. (*Pro Hac Vice*)
One Rockefeller Plaza, 10th Fl., Suite 1060
New York, NY 10020
T: (917) 633-6860
kkramer@dgwllp.com
lwu@dgwllp.com
*Counsel for Chap. 7 Trustee  Jeoffrey Burtch*